641 So.2d 1133 (1994)
David Alex PARKER
v.
Brenda Jane Buckley PARKER.
No. 92-CA-0602.
Supreme Court of Mississippi.
August 4, 1994.
*1134 Billie J. Graham, Leonard B. Melvin, Melvin & Melvin, Laurel, MS, for appellant.
Bobby L. Shoemaker, Bay Springs, MS, for appellee.
Before En Banc.
PRATHER, Presiding Justice, For The Court:

I. INTRODUCTION
In this divorce case, the plaintiff-appellant, David Parker, appeals from an award of 30% of his vested profit sharing plan to the defendant-appellee, Brenda Parker, by the Jasper County Chancery Court. On appeal, David raises the sole issue of whether the chancellor erred in awarding Brenda a portion of his profit sharing plan.

II. FACTS
The parties, who were married on November 20, 1971, and separated in September of 1990, were granted a divorce on the ground of irreconcilable differences. At the time of trial on May 12, 1992, David had been employed at Hot Mix Asphalt, Inc., a subsidiary of Bush Construction Company, Inc., in Laurel, Mississippi, for 22 years. Brenda had worked at several different jobs during the course of the marriage. She worked outside the home for approximately 8 1/2 to 10 years of the 20 year marriage, and on the date of the hearing had been employed at Stringer Waterworks for six years. Two children, ages 16 and 12 at the time of trial, were born to the union. At trial Brenda presented evidence of a yearly income of $12,000 and David presented evidence of a yearly income of $30,562.12.
The parties consented to the chancellor's division of certain marital assets, i.e., use and occupancy of the marital home, alimony, division of certain items of personal property, and Brenda's entitlement to a portion of David's vested interest in the profit sharing plan with his employer. As of May 12, 1992, David was fully vested in the plan with a current value of $64,610.30. One hundred percent of the contributions to the plan were made by David's employer. At trial, the *1135 chancellor awarded Brenda, among other things, 30% of David's vested interest in the profit sharing plan. The chancellor reserved the authority to enter a subsequent order relating to the award of a percentage of the profit sharing plan.
After a hearing, the chancellor entered an order purporting to be a Qualified Domestic Relations Order (QDRO) pursuant to Section 26 U.S.C.A. § 414(p) of the Internal Revenue Code. The judgment assigned to Brenda a 30% interest in David's vested interest in the company's profit sharing plan as of May 12, 1992,[1] and Brenda was named as alternate payee and beneficiary. It was ordered that Brenda's funds "be set aside in a separate account with distribution to Brenda Jane Buckley or her beneficiary at the earliest retirement age of the participant, David Alex Parker ... which is 50 years of age, his death, or termination of his service with Bush."[2]

III. FEDERAL STATUTORY BACKGROUND
Since the sole issue in this appeal deals with the correctness of the chancellor's award to the wife of a percentage of the husband's vested profit sharing plan, a brief summary of the federal statutory scheme on this subject is in order.[3]
The Employee Retirement Income Security Act of 1974, Pub.L. 93-406, 88 Stat. 829 (1974), commonly referred to as ERISA, was enacted by Congress to afford protection for the benefit of participants in qualified pension plans, profit sharing plans, or stock bonus plans. The tax provisions of ERISA are found at 26 U.S.C.A. §§ 401-420 (1986 & Supp. 1993) while the labor provisions (participation, vesting, funding, etc.) are found at 29 U.S.C.A. §§ 1001-1461 (1986 & Supp. 1993). The basic policy finding by Congress set forth in 29 U.S.C.A. § 1001 (1986) was:
the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope and economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; that they have become an important factor in commerce because of the interstate character of their activities, and the activities of their participants, and the employers, employee organizations, and other entities by which they are established or maintained; that a large volume of the activities of such plans is carried on by means of the mails and instrumentalities of interstate commerce; that owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans.
The need of federal legislation in this field is illuminated by the scope of pension plans. "When ERISA was enacted in 1974, some [30 million] employees were covered by private pension plans with at least [175] million dollars in assets... . Pension plans constitute the largest block of private capital in the United States, and `represent the world's largest identifiable source of private wealth.'" Gregory, 48 U.Pitt.L.Rev. 427, 435 (1987). ERISA preempted state authority in the regulation of private pension plans and related employment benefits, while it acknowledges some degree of state authority. The 1984 Retirement Equity Act (REA) provided *1136 this interaction between the federal and state authorities, in the area of domestic relations law.
As originally enacted, ERISA provided that accrued pension benefits could not be assigned or alienated. Because of the preemptive effect of ERISA, this provision was interpreted as prohibiting state family courts from assigning pension benefits to a participant's spouse or children. This "anti-alienation" rule of ERISA gave rise to an "implied family law exception" in some courts, to permit state domestic relations courts the authority to assign pension benefits to a participant's spouse and/or children in a divorce action. A.T. & T. v. Merry, 592 F.2d 118, 121-23 (2nd Cir.1979); Senco, Inc. v. Clark, 473 F. Supp. 902, 907-08 (M.D.Fla. 1979). However, conflicting decisions began to arise in courts across the country. In order to bring uniformity to the various judicial positions taken, Congress enacted the Retirement Equity Act of 1984, Pub.L. No. 98-397, 98 Stat. 1426 (1984), now codified as "REA."
Among other changes, REA amended ERISA to permit a limited exception to the anti-alienation rule. "REA recognized that the spouse of a participant has a financial interest in benefits provided under a plan [and] that this financial interest should not be subject to the dominion and control of the participant." M. Wilf, S. Simmons, W. Lieber, J. Lindquist, I. Cohen, R. Blum, The REA Book, I-1, (1991). The amendment permitted state domestic relations courts to enter a "Qualified Domestic Relations Order" (QDRO) to assign to a spouse rights in the participant's pension plan. 26 U.S.C.A. § 414(p) (Supp. 1993); 29 U.S.C.A. § 1056(d)(3) (1985). (See appendix).
Notwithstanding the preemptive effect of ERISA, the entitlement of an individual to an interest in a former spouse's pension benefits remains a matter to be determined under state domestic relations law; REA merely mandates the requirements for enforcement of such rights in an ERISA-covered pension plan. Thus, in the absence of a QDRO, a divorce and the settlement of all marital property rights extinguishes all enforceable rights of an individual against an ERISA-covered pension plan in which the individual's former spouse is participating.
The requirements of a Qualified Domestic Relations Order are set forth in the statute. To become "qualified," a court order, judgment, or decree must:
(1) be made pursuant to state domestic relations law;
(2) relate to the provision of child support, alimony or marital property rights to a spouse, former spouse, child, or other dependents of a plan participant;
(3) create or recognize the existence of an alternate payee's (such as a spouse's, former spouse's, child's or their dependents') right to, or assign to an alternate payee, a portion of a participant's benefits under a plan;
(4) contain certain information identifying the plan and how the alternate payee's portion is to be determined; and
(5) not require a plan to provide a benefit not otherwise available nor require the payment of increased benefits nor may the order require the payment of benefits which are required to be paid under a previously issued QDRO.
26 U.S.C.A. § 414(p)(1)-(3) (Supp. 1993); 29 U.S.C.A. § 1056(d)(3) (Supp. 1993).
The QDRO rules apply only to pension plans subject to ERISA and plans intended to be "tax qualified" under the Internal Revenue Code. 26 U.S.C.A. § 401; 29 U.S.C.A. §§ 1002(2)(A), 1003(a). Pension plans maintained by a tax-exempt employer, a government, or a church are subject to these rules. 26 U.S.C.A. § 414(p)(11); 29 U.S.C.A. § 1003(b). Plans intending to be "tax qualified" and maintained by private employers, such as pension, profit sharing and stock bonus plans, will be subject to these provisions. 26 U.S.C.A. §§ 401, 414(p).[4]
*1137 With this broad overview of the interplay of federal and state law, let us now turn to the issue raised on appeal.

IV. ANALYSIS

Did the chancellor err in awarding Brenda a portion of David's profit sharing plan?

1. Standard of Review
Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule. Stevison v. Woods, 560 So.2d 176, 180 (Miss. 1990).
"This Court will not disturb the findings of a Chancellor unless the Chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990). See also Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993); Faries v. Faries, 607 So.2d 1204, 1208 (Miss. 1992).
In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990). "If we find substantial evidence supporting the chancellor's fact findings, they are beyond our power to disturb." Tedford v. Dempsey, 437 So.2d 410, 417 (Miss. 1983).
In Mississippi, the chancellor is not required to equally divide the property of the two parties to a divorce because Mississippi is not a community property state. Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986). The chancellor does, however, retain the power and authority to effect an equitable division of jointly accumulated property acquired during the marriage and the division of property and his decision will not be overruled absent manifest error. Dillon, 498 So.2d at 330-31.

2. Parties' Arguments
David argues the law is clear that the courts are powerless to order one spouse to divest himself of property for the benefit of another spouse. While Brenda claimed an interest in the plan because she had worked with her husband to acquire marital assets, David argues that it cannot be said that she is entitled to an equitable interest in the plan because David's employer was the only one who contributed to the plan.
Brenda argues that because the entire amount of the profit sharing plan was accumulated during the marriage, she is entitled to a percentage of the plan. She contributed to the plan by working both at home and outside the home, and her work allowed David to work overtime and assist his employer to turn a profit, from which profit the plan was funded.

3. Chancellor's Findings
With regard to the profit sharing plan, the chancellor made the following finding:
The Court has considered the assets of the parties, their income and expenses and their wage earning capacity, which includes their present estates and their abilities to add to those estates in the future. The Court has considered that this is a 20-year marriage, to which two children were born, that Mr. Parker had been employed during all of that time and Mrs. Parker has been employed approximately 50 percent of the time and has been a housewife, taking care of the home and the children the other 50 percent. The Court finds that both parties are in good health, that Mr. Parker has a substantially greater wage earning capacity, even though Mrs. Parker, at $10.00 an hour, is doing very well. In considering these factors, it is the opinion of the Court that Mrs. Parker should be awarded 30 percent of Mr. Parker's currently vested profit sharing plan; and a qualified domestic relations order to that effect will be entered.
The chancellor fully analyzed the facts and found that, given the length of the marriage and the disparity of incomes, Brenda was entitled to a percentage of David's profit sharing plan.[5] Brenda contributed to the marital assets and, indirectly, to David's *1138 profit sharing plan. David's quality work for his employer, which resulted in job security and a vested pension, is, in part, a result of Brenda's efforts. She worked both in and outside the home, providing income for the family and helping create a stable home life for the Parker family.

4. Analysis
That a chancellor may order a fair division of jointly accumulated property incident to divorce, consistent with the equities and all other relevant facts and circumstances, is far from novel to this Court. Brown v. Brown, 574 So.2d 688, 690-91 (Miss. 1990) (citing Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990)); Robinson v. Irwin, 546 So.2d 683, 685 (Miss. 1989); Jones v. Jones, 532 So.2d 574, 580-81 (Miss. 1988); Regan v. Regan, 507 So.2d 54, 56 (Miss. 1987); Watts v. Watts, 466 So.2d 889, 891 (Miss. 1985); Clark v. Clark, 293 So.2d 447, 450 (Miss. 1974). Even where jointly accumulated property is titled in the name of only one spouse, when the other has made a material contribution toward its acquisition, the chancellor's broad equitable powers allow him to award an equitable interest in such jointly accumulated property. Jones, 532 So.2d at 580 (citing Chrismond v. Chrismond, 211 Miss. 746, 756-58, 52 So.2d 624, 628-29 (1951), cert. den., 342 U.S. 878, 72 S.Ct. 167, 96 L.Ed. 659 (1951)); Watts, 466 So.2d at 890-91. The chancellor's authority to order an equitable division of jointly accumulated property extends to the transfer of title to real property, even when this requires divesting of title. Draper v. Draper, 627 So.2d 302, 305 (Miss. 1993); Jones, 532 So.2d at 580-81. Additionally, the chancellor is not limited to a consideration of the cash contributions made by each party in determining what division is equitable. In Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), this Court held that "assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor." For a further discussion of marital assets see Hemsley, supra.
Profit sharing plans acquired during the course of the marriage are marital assets subject to adjudication by the chancery court granting a divorce, depending upon the facts and circumstances of each particular case. In Bowe v. Bowe, 557 So.2d 793 (Miss. 1990), this Court acknowledged that chancery courts have options to award periodic or lump sum alimony, to divide jointly owned property, or to award an equitable interest in property which is owned by one of the parties. Id. Once such an award has been adjudicated pursuant to Mississippi law, i.e., equitable division, the parties may seek qualification of the interest in the pension plan under federal law if the state court order is properly drawn under ERISA, as amended by the REA. If the order is properly drawn and approved by the pension plan administrator, under federal law it becomes "qualified" and vests an interest in the alternate payee.
David's profit sharing plan is a form of "savings" or "investment" available to him only upon his termination of service with Bush, his retirement, or his death. Had David's employer not provided this form of retirement, the couple would likely have foregone some luxuries or non-essentials in order to fund an independent account with either David's or Brenda's wages, or some combination thereof. If the Parkers had funded such an independent account titled only in David's name, this Court would not likely assume that this account was intended to provide only for David or that it was his "separate" estate. It would be equally short-sighted to assume that the pension sharing plan funded by David's employer was intended to be David's "separate" estate, to provide only for David. Surely if Brenda had so intended, she would have diverted some of her earned wages from family use to fund her own savings account. But instead, as a plan was being funded by Bush, both Brenda's and David's wages were available to the family for other purposes.
Brenda could not have directly contributed to an employer funded profit sharing plan in David's name, but she could have directly contributed to her own savings plan. However, rather than investing her wages for her own benefit, she contributed them to the family. Although Brenda's contributions *1139 were not made directly to David's profit sharing plan, she nonetheless made indirect material contributions via her work both in and outside the home. While David contributed to his profit sharing plan by virtue of his labor, Brenda contributed by virtue of domestic services and earned income enjoyed by both parties, rather than invested in only Brenda's name. As there are not separate plans or accounts for each party, it is only equitable to allow both Brenda and David to enjoy the one existing plan, to which both have materially contributed in some manner. In Hemsley, supra, this Court held that "marital partners can be equal contributors whether or not they both are at work in the marketplace." Since Brenda made material contributions as both a homemaker and a wage earner, she is equitably entitled to some portion of David's pension sharing plan.
This holding is not in conflict with prior decisions of this Court which hold that a spouse does not have a "vested" right in jointly acquired property. Armstrong v. Armstrong, 618 So.2d 1278, 1282 (Miss. 1993); Brown v. Brown, 574 So.2d 688, 690-91 (Miss. 1990); Southern v. Glenn, 568 So.2d 281, 283-84 n. 1 (Miss. 1990); Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990). The alternate payee's interest in a pension plan vests only after (1) a chancellor has determined that an equitable division of the marital assets requires awarding some portion of one spouse's pension or profit sharing plan to the other spouse and (2) a QDRO is entered and accepted as qualified. In other words, if apportionment of one spouse's pension or profit sharing plan is not equitable, based on the facts and circumstances presented, no right in such a plan in favor of the other spouse can ever vest.
This Court holds that the chancellor was not manifestly in error in this judgment and the ruling of the trial court is affirmed.
JUDGMENT IS AFFIRMED.
SULLIVAN, PITTMAN, BANKS, ROBERTS and SMITH, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by McRAE, J.
McRAE, J., dissents with separate written opinion joined by HAWKINS, C.J.

APPENDIX A

26 U.S.C.S. § 414 (1993)
(p) Qualified domestic relations order defined. For purposes of this subsection and section 401(a)(13) 
(1) In general.
(A) Qualified domestic relations order. The term `qualified domestic relations order' means a domestic relations order 
(i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
(ii) with respect to which the requirements of paragraphs (2) and (3) are met.
(B) Domestic relations order. The term `domestic relations order' means any judgment, decree, or order (including approval of a property settlement agreement) which 
(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
(ii) is made pursuant to a State domestic relations law (including a community property law).
(2) Order must clearly specify certain facts. A domestic relations order meets the requirements of this paragraph only if such order clearly specifies 
(A) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
(B) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
(C) the number of payments or period to which such order applies, and
*1140 (D) each plan to which such order applies.
(3) Order may not alter amount, form, etc., of benefits. A domestic relations order meets the requirements of this paragraph only if such order 
(A) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
(B) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
(C) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.
(4) Exception for certain payments made after earliest retirement age.
(A) In general. A domestic relations order shall not be treated as failing to meet the requirements of subparagraph (A) of paragraph (3) solely because such order requires that payment of benefits be made to an alternate payee 
(i) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age,
(ii) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of the benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement), and
(iii) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).
For purposes of clause (ii), the interest rate assumption used in determining the present value shall be the interest rate specified in the plan or, if no rate is specified, 5 percent.
(B) Earliest retirement age. For purposes of this paragraph, the term `earliest retirement age' means the earlier of 
(i) the date on which the participant is entitled to a distribution under the plan, or
(ii) the later of 
(I) the date the participant attains age 50, or
(II) the earliest date on which the participant could begin receiving benefits under the plan if the participant separated from service.
(5) Treatment of former spouse as surviving spouse for purposes of determining survivor benefits. To the extent provided in any qualified domestic relations order 
(A) the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of sections 401(a)(11) and 417 (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes), and
(B) if married for at least 1 year, the surviving former spouse shall be treated as meeting the requirements of section 417(d).
(6) Plan procedures with respect to orders.
(A) Notice and determination by administrator. In the case of any domestic relations order received by a plan 
(i) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and
(ii) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.
(B) Plan to establish reasonable procedures. Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders.
(7) Procedures for period during which determination is being made.
*1141 (A) In general. During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this paragraph referred to as the `segregated amounts') which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.
(B) Payment to alternate payee if order determined to be qualified domestic relations order. If within the 18-month period described in subparagraph (E) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.
(C) Payment to plan participant in certain cases. If within the 18-month period described in subparagraph (E) 
(i) it is determined that the order is not a qualified domestic relations order, or
(ii) the issue as to whether such order is a qualified domestic relations order is not resolved,
then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.
(D) Subsequent determination or order to be applied prospectively only. Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in subparagraph (E) shall be applied prospectively only.
(E) Determination of 18-month period. For purposes of this paragraph, the 18-month period described in this subparagraph is the 18-month period beginning with the date on which the first payment would be required to be made under the domestic relations order.
(8) Alternate payee defined. The term `alternate payee' means any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.
(9) Subsection not to apply to plans to which section 401(a)(13) does not apply. This subsection shall not apply to any plan to which section 401(a)(13) does not apply. For purposes of this title, except as provided in regulations, any distribution from an annuity contract under section 403(b) pursuant to a qualified domestic relations order shall be treated in the same manner as a distribution from a plan to which section 401(a)(13) applies.
(10) Waiver of certain distribution requirements. With respect to the requirements of subsections (a) and (k) of section 401, section 403(b), and section 409(d), a plan shall not be treated as failing to meet such requirements solely by reason of payments to an alternative payee pursuant to a qualified domestic relations order.
(11) Application of rules to governmental and church plans. For purposes of this title, a distribution or payment from a governmental plan (as defined in subsection (d)) or a church plan (as described in subsection (e)) shall be treated as made pursuant to a qualified domestic relations order if it is made pursuant to a domestic relations order which meets the requirement of clause (i) of paragraph (1)(A).
(12) Consultation with the Secretary. In prescribing regulations under this subsection and section 401(a)(13), the Secretary of Labor shall consult with the Secretary.
(q) Highly compensated employee.
(1) In general. The term `highly compensated employee' means any employee who, during the year or the preceding year 
(A) was at any time a 5-percent owner,
(B) received compensation from the employer in excess of $75,000,
(C) received compensation from the employer in excess of $50,000 and was in the top-paid group of employees for such year, or
(D) was at any time an officer and received compensation greater than 50 percent *1142 of the amount in effect under section 415(b)(1)(A) for such year.
The Secretary shall adjust the $75,000 and $50,000 amounts under this paragraph at the same time and in the same manner as under section 415(d).
(2) Special rule for current year. In the case of the year for which the relevant determination is being made, an employee not described in subparagraph (B), (C), or (D) of paragraph (1) for the preceding year (without regard to this paragraph) shall not be treated as described in subparagraph (B), (C), or (D) of paragraph (1) unless such employee is a member of the group consisting of the 100 employees paid the greatest compensation during the year for which such determination is being made.
(3) 5-percent owner. An employee shall be treated as a 5-percent owner for any year if at any time during such year such employee was a 5-percent owner (as defined in section 416(i)(1)) of the employer.
(4) Top-paid group. An employee is in the top-paid group of employees for any year if such employee is in the group consisting of the top 20 percent of the employees when ranked on the basis of compensation paid during such year.
(5) Special rules for treatment of officers. 
(A) Not more than 50 officers taken into account. For purposes of paragraph (1)(D), no more than 50 employees (or, if lesser, the greater of 3 employees or 10 percent of the employees) shall be treated as officers.
(B) At least 1 officer taken into account. If for any year no officer of the employer is described in paragraph (1)(D), the highest paid officer of the employer for such year shall be treated as described in such paragraph.
(6) Treatment of certain family members.
(A) In general. If any individual is a member of the family of a 5-percent owner or of a highly compensated employee in the group consisting of the 10 highly compensated employees paid the greatest compensation during the year, then 
(i) such individual shall not be considered a separate employee, and
(ii) any compensation paid to such individual (and any applicable contribution or benefit on behalf of such individual) shall be treated as if it were paid to (or on behalf of) the 5-percent owner or highly compensated employee.
(B) Family. For purposes of subparagraph (A), the term `family' means, with respect to any employee, such employee's spouse and lineal ascendants or descendants and the spouses of such lineal ascendants or descendants.
(C) Rules to apply to other provisions.
(i) In general. Except as provided in regulations and in clause (ii), the rules of subparagraph (A) shall be applied in determining the compensation of (or any contributions or benefits on behalf of) any employee for purposes of any section with respect to which a highly compensated employee is defined by reference to this subsection.
(ii) Exception for determining integration levels. Clause (i) shall not apply in determining the portion of the compensation of a participant which is under the integration level for purposes of section 401(l).
(7) Compensation. For purposes of this subsection 
(A) In general. The term `compensation' means compensation within the meaning of section 415(c)(3).
(B) Certain provisions not taken into account. The determination under subparagraph (A) shall be made 
(i) without regard to sections 125, 402(e)(3), and 402(h)(1)(B), and
(ii) in the case of employer contributions made pursuant to a salary reduction agreement, without regard to section 403(b).
(8) Excluded employees. For purposes of subsection (r) and for purposes of determining the number of employees in the top-paid group under paragraph (4) or the number of officers taken into account under paragraph (5), the following employees shall be excluded 
*1143 (A) employees who have not completed 6 months of service,
(B) employees who normally work less than 17 1/2 hours per week,
(C) employees who normally work during not more than 6 months during any year,
(D) employees who have not attained age 21, and
(E) except to the extent provided in regulations, employees who are included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and the employer.
Except as provided by the Secretary, the employer may elect to apply subparagraph (A), (B), (C), or (D) by substituting a shorter period of service, smaller number of hours or months, or lower age for the period of service, number of hours or months, or age (as the case may be) than that specified in such subparagraph.
(9) Former employees. A former employee shall be treated as a highly compensated employee if 
(A) such employee was a highly compensated employee when such employee separated from service, or
(B) such employee was a highly compensated employee at any time after attaining age 55.
(10) Coordination with other provisions. Subsections (b), (c), (m), (n), and (o) shall be applied before the application of this section.
(11) Special rule for nonresident aliens. For purposes of this subsection and subsection (r), employees who are nonresident aliens and who receive no earned income (within the meaning of section 911(d)(2)) from the employer which constitutes income from sources within the United States (within the meaning of section 861(a)(3)) shall not be treated as employees.
(12) Simplified method for determining highly compensated employees.
(A) In general. If an election by the employer under this paragraph applies to any year, in determining whether an employee is a highly compensated employee for such year 
(i) subparagraph (B) of paragraph (1) shall be applied by substituting `$50,000' for `$75,000', and
(ii) subparagraph (C) of paragraph (1) shall not apply.
(B) Requirement for election. An election under this paragraph shall not apply to any year unless 
(i) at all times during such year, the employer maintained significant business activities (and employed employees) in at least 2 significantly separate geographic areas, and
(ii) the employer satisfies such other conditions as the Secretary may prescribe.
(r) Special rules for separate line of business.
(1) In general. For purposes of sections 129(d)(8) and 410(b), an employer shall be treated as operating separate lines of business during any year if the employer for bona fide business reasons operates separate lines of business.
(2) Line of business must have 50 employees, etc. A line of business shall not be treated as separate under paragraph (1) unless 
(A) such line of business has at least 50 employees who are not excluded under subsection (q)(8),
(B) the employer notifies the Secretary that such line of business is being treated as separate for purpose of paragraph (1), and
(C) such line of business meets guidelines prescribed by the Secretary or the employer receives a determination from the Secretary that such line of business may be treated as separate for purposes of paragraph (1).
(3) Safe harbor rule.
(A) In general. The requirements of subparagraph (C) of paragraph (2) shall not apply to any line of business if the highly compensated employee percentage with respect to such line of business is 
(i) not less than one-half, and
(ii) not more than twice, the percentage which highly compensated employees are of *1144 all employees of the employer. An employer shall be treated as meeting the requirements of clause (i) if at least 10 percent of all highly compensated employees of the employer perform services solely for such line of business.
(B) Determination may be based on preceding year. The requirements of subparagraph (A) shall be treated as met with respect to any line of business if such requirements were met with respect to such line of business for the preceding year and if 
(i) no more than a de minimis number of employees were shifted to or from the line of business after the close of the preceding year, or
(ii) the employees shifted to or from the line of business after the close of the preceding year contained a substantially proportional number of highly compensated employees.
(4) Highly compensated employee percentage defined. For purposes of this subsection, the term `highly compensated employee percentage' means the percentage which highly compensated employees performing services for the line of business are of all employees performing services for the line of business.
(5) Allocation of benefits to line of business. For purposes of this subsection, benefits which are attributable to services provided to a line of business shall be treated as provided by such line of business.
(6) Headquarters personnel, etc. The Secretary shall prescribe rules providing for 
(A) the allocation of headquarters personnel among the lines of business of the employer, and
(B) the treatment of other employees providing services for more than 1 line of business of the employer or not in lines of business meeting the requirements of paragraph (2).
(7) Separate operating units. For purposes of this subsection, the term `separate line of business' includes an operating unit in a separate geographic area separately operated for a bona fide business reason.
(8) Affiliated service groups. This subsection shall not apply in the case of any affiliated service group (within the meaning of section 414(m)).
(s) Compensation. For purposes of any applicable provision 
(1) In general. Except as provided in this subsection, the term `compensation' has the meaning given such term by section 415(c)(3).
(2) Employer may elect to treat certain deferrals as compensation. An employer may elect to include as compensation any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of an employee under section 125, 402(e)(3), 402(h), or 403(b).
(3) Alternative determination of compensation. The Secretary shall by regulation provide for alternative methods of determining compensation which may be used by an employer, except that such regulations shall provide that an employer may not use an alternative method if the use of such method discriminates in favor of highly compensated employees (within the meaning of subsection (q)).
(4) Applicable provision. For purposes of this subsection, the term `applicable provision' means any provision which specifically refers to this subsection.
(t) Application of controlled group rules to certain employee benefits.
(1) In general. All employees who are treated as employed by a single employer under subsection (b), (c), or (m) shall be treated as employed by a single employer for purposes of an applicable section. The provisions of subsection (o) shall apply with respect to the requirements of an applicable section.
(2) Applicable section. For purposes of this subsection, the term `applicable section' means section 79, 106, 117(d), 120, 125, 127, 129, 132, 274(j), 505, or 4980B.

*1145 HISTORY; ANCILLARY LAWS AND DIRECTIVES
AMENDMENTS:
In 1992, P.L. 102-318, Sec. 521(b)(20), substituted `section 402(e)(3)' for `section 402(a)(8)' in subclause (n)(5)(C)(iii)(I)... Sec. 521(b)(21), substituted `402(e)(3)' for `402(a)(8)' in clause (q)(7)(B)(i) ... Sec. 521(b)(22), substituted `402(e)(3)' for `402(a)(8)' in para. (s)(2), effective for distributions after 12/31/92. For special rule, see Sec. 521(e)(2) of this Act which reads as follows:
"(2) Special rule for partial distributions. For purposes of section 402(a)(5)(D)(i)(II) of the Internal Revenue Code of 1986 (as in effect before the amendments made by this section), a distribution before January 1, 1993, which is made before or at the same time as a series of periodic payments shall not be treated as one of such series if it is not substantially equal in amount to other payments in such series."
In 1990, P.L. 101-508, Sec. 11703(b)(1), deleted `(6 months in the case of core health benefits)' after `at least 1 year,' in subpara. (n)(2)(B), effective as provided in Secs. 1151(k)(1) and (4) of P.L. 99-514, reproduced below.
In 1989, P.L. 101-239, Sec. 7811(m)(5), added `section' before `403(b)' in para. (p)(10), effective 12/31/84.
 P.L. 101-239, Sec. 7813(b), corrected Secs. 3011(b)(4) and (5) of P.L. 100-647 which amended subpara. (n)(3)(C) and para. (t)(2) to read `as amended by section 1011B(a) of this Act' instead of `as amended by section 111B(a) of this Act' and to strike out `162(k)' instead of `162(k)(2)', see below.
 P.L. 101-239, Sec. 7841(a)(2), redesignated para. (p)(11) as para. (p)(12) and added new para. (p)(11), effective for transfers after 12/19/89 in tax. yrs. end. after 12/19/89.
 P.L. 101-140, Sec. 203(a)(6)(A), deleted `89,' which followed `79,' in subpara. (n)(3)(C) ... Sec. 203(a)(6)(B), substituted `section' for `sections 89 and' in para. (r)(1) ... Sec. 203(a)(6)(C), deleted `89,' which followed `79,' in para. (t)(2), effective as provided in Sec. 1151(k)(1) and (4) of P.L. 99-514, reproduced below.
 P.L. 101-140, Sec. 204(b)(1), of this Act, effective for yrs. begin. after 12/31/86, provides:
"(b) Line of business test. 
"(1) Application of line of business test for period before guidelines issued.  In the case of any plan year beginning on or before the date the Secretary of the Treasury or his delegate issues guidelines and begins issuing determinations under section 414(r)(2)(C) of the Internal Revenue Code of 1986, an employer shall be treated as operating separate lines of business if the employer reasonably determines that it meets the requirements of section 414(r) (other than paragraph (2)(C) thereof) of such Code."
 P.L. 101-140, Sec. 204(b)(2), substituted `sections 129(d)(8) and 410(b)' for `section 410(b)' in para. (r)(1) [as amended by Sec. 203(a)(6)(B) of this Act, see above], effective for yrs. begin. after 12/31/88.
 P.L. 101-136, Sec. 528, provided that `no monies appropriated by this Act [for the fiscal year ending September 30, '90] may be used to implement or enforce section 1151 of the Tax Reform Act of '86 [P.L. 99-514] or the amendments made by such section.' [See below]
In 1988, P.L. 100-647, Sec. 1011(d)(8), substituted `50 percent of the amount in effect under section 415(b)(1)(A)' for `150 percent of the amount in effect under section 415(c)(1)(A)', effective for tax. yrs. begin. after 12/31/86.
 P.L. 100-647, Sec. 1011(e)(4), added `or any requirement under section 457' after `(n)(3)' in subsec. (o), effective for tax. yrs. begin. after 12/31/88.
 P.L. 100-647, Sec. 1011(h)(5), substituted `(16), (17), and (26)' for `and (16)' in subparas. (m)(4)(A) and (n)(3)(A), effective for plan yrs. begin. after 12/31/88.
 P.L. 100-647, Sec. 1011(i)(1), added the sentence at the end of para. (q)(1) ... Sec. 1011(i)(2), added subpara. (q)(6)(C) ... Sec. 1011(i)(3)(A), added `and' at the end of subpara. (q)(8)(D), substituted a period for `, and' at the end of subpara. (q)(8)(E), deleted *1146 subpara. (q)(8)(F) and substituted `Except as provided by the Secretary, the' for `The' in the last sentence of para. (q)(8) ... Sec. 1011(i)(3)(B), added para. (q)(11) ... Sec. 1011(i)(4)(A), added `or the number of officers taken into account under paragraph (5)' after `paragraph (4)' in para. (q)(8) ... Sec. 1011(j)(1), amended para. (s)(1) ... Sec. 1011(j)(2), deleted para. (s)(2), redesignated paras. (s)(3) and (s)(4) as paras. (s)(2) and (s)(3) and added new para. (s)(4), effective for yrs. begin. after 12/31/86.
Prior to deletion, subpara. (q)(8)(F) read as follows:
"(F) employees who are nonresident aliens and who receive no earned income (within the meaning of section 911(d)(2)) from the employer which constitutes income from sources within the United States (within the meaning of section 861(a)(3))."
Prior to amendment, para. (s)(1) read as follows:
"(1) In general. The term `compensation' means compensation for service performed for an employer which (taking into account the provisions of this chapter) is currently includible in gross income."
Prior to deletion, para. (s)(2) read as follows:
"(2) Self-employed individuals. The Secretary shall prescribe regulations for the determination of the compensation of an employee who is a self-employed individual (within the meaning of section 401(c)(1) which are based on the principles of paragraph (1)."
 P.L. 100-647, Sec. 1011(l)(12), amended Sec. 1117 [reproduced below] of P.L. 99-514, by adding new para. 1117(d)(4), see below.
 P.L. 100-647, Sec. 1011A(b)(3), added `72(d) (relating to treatment of employee contributions as separate contract),' before `411(a)(7)(A)' in para. (k)(2), effective for amounts distributed after 12/31/86, in tax. yrs. end. after 12/31/86.
 P.L. 100-647, Sec. 1011B(a)(16), added `and' at the end of subpara. (m)(4)(A), substituted a period for a comma at the end of subpara. (m)(4)(B) and deleted subparas. (m)(4)(C) and (m)(4)(D) ... Sec. 1011B(a)(17), substituted `132, 162(i)(2), 162(k),' for `132,' in para. (t)(2) ... Sec. 1011B(a)(19), substituted `132, 162(i)(2), 162(k),' for `132,' in subpara. (n)(3)(C) ... Sec. 1011B(a)(20), deleted `of section 414' each place it appeared in para. (t)(1), effective as provided in Secs. 1115(k)(1) and (4) of P.L. 99-514 [reproduced below].
Prior to deletion subparas. (m)(4)(C), (D) read as follows:
"(C) section 105(h), and
"(D) section 125."
 P.L. 100-647, Sec. 1011B(a)(25), added the last sentence to Sec. 1151(k)(1) of P.L. 99-514 [reproduced below], part of the effective date for changes made by Sec. 1151(e)(1) and (i) of P.L. 99-514, see below
 P.L. 100-647, Sec. 1018(t)(8)(E), substituted `means the earlier of' for `means earlier of' and deleted `in' each place it appeared in subpara. (p)(4)(B) ... Sec. 1018(t)(8)(F), added `, 403(b),' after `401' in para. (p)(10) ... Sec. 1018(t)(8)(G), added the sentence at the end of para. (p)(9), effective 12/31/84.
 P.L. 100-647, Sec. 2005(c)(1), added para. (l)(2) ... Sec. 2005(c)(2), amended the heading of subsec. (l), effective for transactions occurring after 7/26/88.
Sec. 2005(c)(3)(B) of this Act provides:
"(B) The amendments made by this subsection shall not apply to any transaction occurring after 7-26-88, if on or before such date the board of directors of the employer, approves such transaction or the employer took similar binding action."
Prior to amendment the heading of subsec. (l) read as follows:
"(l) Mergers and consolidations of plans or transfers of plan assets."
 P.L. 100-647, Sec. 3011(b)(4), [as amended by Sec. 7813(b) of P.L. 101-239, see above] deleted `162(i)(2), 162(k)' before `247(j)' and substituted `505, and 4980B' for `and 505' in subpara. (n)(3)(C) [as amended by section 1011B(a) of this Act] ... Sec. 3011(b)(5), [as amended by Sec. 7813(b) of P.L. 101-239, see above] deleted `162(i)(2), 162(k)(2) [sic]' before `274(j)' and substituted *1147 `505, or 4980B' for `or 505' in para. (t)(2) [as amended by section 1011B(a) of this Act], effective for tax. yrs. begin. after 12/31/88, but shall not apply to any plan for any plan year to which '86 Code Sec. 162(k) (as in effect on 11/9/88) did not apply by reason of section 10001(e)(2) of P.L. 99-272.
 P.L. 100-647, Sec. 3021(b)(1), added para. (q)(12) ... Sec. 3021(b)(2)(A), amended para. (r)(3), effective for yrs. begin. after 12/31/86.
Prior to amendment, para. (r)(3) read as follows:
"(3) Safe harbor rule. The requirements of subparagraph (C) of paragraph (2) shall not apply to any line of business if the highly compensated employee percentage with respect to such line of business is 
"(A) not less than one-half, and
"(B) not more than twice,
the percentage which highly compensated employees are of all employees of the employer. An employer shall be treated as meeting the requirements of subparagraph (A) if at least 10 percent of all highly compensated employees of the employer perform services solely for such line of business."
 P.L. 100-647, Sec. 6067(a), added subpara. (l)(2)(G), effective for transactions occurring after 7/26/88. For special rules, see Sec. 2005(c)(3)(B) reproduced above.
Sec. 6067(b) of this Act provides:
"(b) Study. The Secretary of the Treasury or his delegate, in consultation with the Federal Deposit Insurance Corporation, shall conduct a study with respect to the proper method of allocating assets in the case of a transaction to which the amendment made by this subsection applies. The Secretary of the Treasury shall not later than 1-1-90, report the results of such study to the Committee on Ways and Means of the House of Representatives and to the Committee on Finance of the Senate."
In 1987, P.L. 100-203, Sec. 9305(c), deleted `the minimum funding standard of section 412, the tax imposed by section 4971, and' after `more than one such corporation,' in subsec. (b), effective for plan years begin. after 12/31/87.
In 1986, P.L. 99-514, Sec. 1114(a), added subsec. (q), effective for yrs. begin. after 12/31/86. For special rule for determining highly compensated employees, see Sec. 1114(c)(4) of this Act reproduced in note following Code Sec. 401.
 P.L. 99-514, Sec. 1114(b)(11), substituted `highly compensated employees (within the meaning of section 414(q))' for `officers, highly compensated employees, or owners', in clause (m)(2)(B)(ii), effective for yrs. begin. after 12/31/88.
 P.L. 99-514, Sec. 1115(a), added subsecs. (r) and (s), effective for yrs. begin. after 12/31/86.
 P.L. 99-514, Sec. 1117(c), substituted `, 415 (relating to limitations on benefits and contributions under qualified plans), and 401(m) (relating to nondiscrimination tests for matching requirements and employee contributions)' for `and 415 (relating to limitations on benefits and contributions under qualified plans)' in para. (k)(2), effective for plan yrs. begin. after 12/31/86. For special rules, see Sec. 1117(d)(2)-(4) of P.L. 99-514 [as added by P.L. 100-647, Sec. 1011(l)(12)] reproduced in note following Code Sec. 401.
 P.L. 99-514, Sec. 1146(a)(1), amended para. (n)(5), effective for services performed after 12/31/86.
Prior to amendment, para. (n)(5) read as follows:
"(5) Safe harbor. This subsection shall not apply to any leased employee if such employee is covered by a plan which is maintained by the leasing organization if, with respect to such employee, such plan 
"(A) is a money purchase pension plan with a nonintegrated employer contribution rate of at least 7 1/2 percent, and
"(B) provides for immediate participation and for full and immediate vesting."
 P.L. 99-514, Sec. 1146(a)(2), amended para. (n)(4) ... Sec. 1146(a)(3), amended para. (n)(6) ... Sec. 1146(b)(1), added the sentence at the end of subsec. (o) ... Sec. 1146(b)(2), deleted `except to the extent otherwise provided in regulations,' following *1148 `listed in paragraph (3),' in para. (n)(1), effective for tax. yrs. begin after 12/31/83. Sec. 1146(c)(3) of this Act provides:
"(3) Recordkeeping requirements. In the case of years beginning before the date of the enactment of this Act, the last sentence of section 414(o) shall be applied without regard to the requirement that an insignificant percentage of the workload be performed by persons other than employees."
Prior to amendment, paras. (n)(4) and (n)(6) read as follows:
"(4) Time when leased employee is first considered as employee. In the case of any leased employee, paragraph (1) shall apply only for purposes of determining whether the pension requirements listed in paragraph (3) are met for periods after the close of the 1-year period referred to in paragraph (2); except that years of service for the recipient shall be determined by taking into account the entire period for which the leased employee performed services for the recipient (or related persons)."
"(6) Related persons. For purposes of this subsection, the term `related persons' has the same meaning as when used in section 103(b)(6)(C)."
 P.L. 99-514, Sec. 1151(e)(1), added subsec. (t) ... Sec. 1151(i)(1), substituted `requirements' for `pension requirements' in para. (n)(1) ... Sec. 1151(i)(2), added `(6 months in the case of core health benefits)' after `1 year' in subpara. (n)(2)(B) ... Sec. 1151(i)(3), substituted `Requirements' for `Pension requirements' in the heading of para. (n)(3), substituted `requirements' for `pension requirements' in para. (n)(3), deleted the `and' at the end of subpara. (n)(3)(A), substituted `and' for the period at the end of subpara. (n)(3)(B), and added new subpara. (n)(3)(C), effective as provided in Secs. 1151(k)(1) [as amended by Sec. 1011B(a)(25) of P.L. 100-647, see above] and (4) of this Act which read as follows:
"(1) In general.  The amendments made by this section shall apply to years beginning after the later of 
"(A) December 31, 1987, or
"(B) the earlier of 
"(i) the date which is 3 months after the date on which the Secretary of the Treasury or his delegate issues such regulations as are necessary to carry out the provisions of section 89 of the Internal Revenue Code of 1986 (as added by this section), or
"(ii) December 31, 1988."
"Notwithstanding the preceding sentence, the amendments made by subsections (e)(1) and (i)(3)(C) shall, to the extent they relate to sections 106, 162(i)(2), and 162(k) of the Internal Revenue Code of 1986, apply to years beginning after 1986."
* * *
"(4) Special rule for church plans.  In the case of a church plan (within the meaning of section 414(e)(3) of the Internal Revenue Code of 1986) maintaining an insured accident and health plan, the amendments made by this section shall apply to years beginning after December 31, 1988."
 P.L. 99-514, Sec. 1301(j)(4), substituted `section 144(a)(3)' for `section 103(b)(6)(C)' in paras. (m)(5) and (n)(6), effective for bonds issued after 8/15/86. For transitional rules, see Secs. 1312-1318 of P.L. 99-514 at note following Code Sec. 103.
 P.L. 99-514, Sec. 1852(f), amended P.L. 98-369, Sec. 526(d)(2) by deleting para. (m)(7) instead of para. (m)(6), see below, effective 7/18/84.
 P.L. 99-514, Sec. 1898(c)(2)(A)(i), substituted "shall separately account for the amounts (hereinafter in this paragraph referred to as the `segregated amounts')" for "shall segregate in a separate account in the plan or in an escrow account the amounts" in subpara. (p)(7)(A) ... Sec. 1898(c)(2)(A)(ii), substituted "the 18-month period described in subparagraph (E)" for "18 months" and substituted "including any interest" for "plus any interest" in subpara. (p)(7)(B) ... Sec. 1898(c)(2)(A)(iii), substituted "the 18-month period described in subparagraph (E)" for "18 months" and substituted "including any interest" for "plus any interest" in subpara. (p)(7)(C) ... Sec. 1898(c)(2)(A)(iv), substituted "the 18-month period described in subparagraph (E)" for "the 18-month period" in *1149 subpara. (p)(7)(D) ... Sec. 1898(c)(2)(A)(v), added subpara. (p)(7)(E) ... Sec. 1898(c)(4)(A), redesignated para. (p)(9) as para. (p)(11) and added new para. (p)(9) ... Sec. 1898(c)(6)(A), substituted "sections 401(a)(11) and 417 (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)" for "sections 401(a)(11) and 417" in subpara. (p)(5)(A) ... Sec. 1898(c)(7)(A)(ii), substituted "to a spouse, former spouse" for "to a spouse" in clause (p)(1)(B)(i) ... Sec. 1898(c)(7)(A)(iii), substituted "each alternate payee" for "any other alternate payee" in clause (p)(6)(A)(i) ... Sec. 1898(c)(7)(A)(iv), substituted "the surviving former spouse" for "the surviving spouse" in subpara. (p)(5)(B) ... Sec. 1898(c)(7)(A)(v), deleted the last sentence of para. (p)(5) and added new para. (p)(10) ... Sec. 1898(c)(7)(A)(vi), substituted "A" for "In the case of any payment before a participant has separated from service, a" in subpara. (p)(4)(A) ... Sec. 1898(c)(7)(A)(vi), added "in the case of any payment before a participant has separated from service," before "on or" in clause (p)(4)(A)(i) ... Sec. 1898(c)(7)(A)(vii), amended subpara. (p)(4)(B), effective 12/31/84 except as provided in Sec. 303 of P.L. 98-397 at note following Code Sec. 401.
Prior to deletion, the last sentence of para. (p)(5) read as follows: "A plan shall not be treated as failing to meet the requirements of subsection (a) or (k) of section 401 which prohibit payment of benefits before termination of employment solely by reason of payments to an alternate payee pursuant to a qualified domestic relations order."
Prior to amendment, subpara. (p)(4)(B) read as follows:
"(B) Earliest retirement age. For purposes of this paragraph, the term "earliest retirement age" has the meaning given such term by section 417(f)(3), except that in the case of any defined contribution plan, the earliest retirement age shall be the date which is 10 years before the normal retirement age (within the meaning of section 411(a)(8))."
 P.L. 99-514, Sec. 1899A(12), deleted the comma after "benefits" in subpara. (p)(3)(B), effective 10/22/86.
In 1984, P.L. 98-397, Sec. 204(b), added subsec. (p), effective for plan years begin. after 12/31/84, except as provided in Sec. 302(b) of this Act reproduced in note following Code Sec. 402. For transitional rules see Sec. 303 of this Act, reproduced in note following Code Sec. 401.
 P.L. 98-369, Sec. 491(d)(26), deleted "or 405(a)" after "section 403(a)" in subpara. (h)(1)(B) ... Sec. 491(d)(27), deleted "or 405" after "section 403(a)" in subsec. (l), effective for obligations issued after 12/31/83.
 P.L. 98-369, Sec. 526(a)(1), substituted "section 318(a)" for "section 267(c)" in subpara. (m)(6)(B), effective for tax. yrs. begin. after 12/31/84.
 P.L. 98-369, Sec. 526(b)(1), substituted "any person who is not an employee of the recipient" for "any person" in para. (n)(2), effective for tax. yrs. begin. after 12/31/83.
 P.L. 98-369, Sec. 526(d)(1), added subsec. (o) ... Sec. 526(d)(2), [as amended by Sec. 1852(f) of P.L. 99-514, see above], deleted para. (m)(7), effective 7/18/84.
Prior to amendment, para. (m)(7) read as follows:
"(7) Prevention of avoidance. The Secretary shall prescribe such regulations as may be necessary to prevent the avoidance with respect to service organizations, through the use of separate organizations, of any employee benefit requirement listed in paragraph (4)."
 P.L. 98-369, Sec. 713(i), substituted "any person who is not an employee of the recipient" for "any person" in para. (n)(2), effective for tax. yrs. begin. after 12/31/83.
In 1982, P.L. 97-248, Sec. 240(c)(1), substituted "415, and 416" for "and 415" in subsecs. (b) and (c) ... Sec. 240(c)(2), substituted "415, and 416" for "and 415" in para. (m)(4), effective for yrs. begin. after 12/31/83.
 P.L. 97-248, Sec. 246(a), redesignated paras. (m)(5) and (m)(6) as paras. (m)(6) and (m)(7), and added a new para. (m)(5), effective for tax. yrs. begin. after 12/31/83.
*1150  P.L. 97-248, Sec. 248(a), added new subsec. (n), effective for tax. yrs. begin. after 12/31/83.
In 1980, P.L. 96-613, Sec. 5(a), added subsec. (m), the same amendment as Sec. 201(a) of P.L. 96-605, see below.
 P.L. 96-605, Sec. 201(a), added subsec. (m), effective for plan yrs. ending after 11/30/80 except as provided by Sec. 201(c)(2) of the Act which reads as follows:
"(2) Plans in existence on November 30, 1980. In the case of a plan in existence on November 30, 1980, the amendments made by this section shall apply to plan years beginning after November 30, 1980."
 P.L. 96-364, Sec. 207(a), amended subsec. (f), effective 9/26/80.
Prior to amendment, subsec. (f) read as follows:
"(f) Multiemployer plan.
"(1) In general, For purposes of this part, the term "multiemployer plan" means a plan 
"(A) to which more than one employer is required to contribute,
"(B) which is maintained pursuant to a collective-bargaining agreement between employee representatives and more than one employer,
"(C) under which the amount of contributions made under the plan for a plan year by each employer making such contributions is less than 50 percent of the aggregate amount of contributions made under the plan for that plan year by all employers making such contributions,
"(D) under which benefits are payable with respect to each participant without regard to the cessation of contributions by the employer who employed that participant except to the extent that such benefits accrued as a result of service with the employer before such employer was required to contribute to such plan, and
"(E) which satisfies such other requirements as the Secretary of Labor may by regulations prescribe.
"(2) Special rules. For purposes of this subsection 
"(A) If a plan is a multiemployer plan within the meaning of paragraph (1) for any plan year, subparagraph (C) of paragraph (1) shall be applied by substituting "75 percent" for "50 percent" for each subsequent plan year until the first plan year following a plan year in which the plan had one employer who made contributions of 75 percent or more of the aggregate amount of contributions made under the plan for that plan year by all employers making such contributions.
"(B) All corporations which are members of a controlled group of corporations (within the meaning of section 1563(a), determined without regard to section 1563(e)(3)(C)) shall be deemed to be one employer."
 P.L. 96-364, Sec. 208(a), amended the last sentence of subsec. (l), effective 9/26/80.
Prior to amendment, the last sentence of subsec. (l) read as follows:
"This paragraph shall apply in the case of a multiemployer plan only to the extent determined by the Pension Benefit Guaranty Corporation."
 P.L. 96-364, Sec. 407(b), amended subsec. (e), effective 1/1/74.
Prior to amendment, subsec. (e) read as follows:
"(e) Church plan.
"(1) In general. For purposes of this part the term "church plan" means 
"(A) a plan established and maintained for its employees by a church or by a convention or association of churches which is exempt from tax under section 501, or
"(B) a plan described in paragraph (3).
"(2) Certain unrelated business or multiemployer plans. The term "church plan" does not include a plan 
"(A) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513), or
*1151 "(B) which is a plan maintained by more than one employer, if one or more of the employers in the plan is not a church (or a convention or association of churches) which is exempt from tax under section 501.
"(3) Special temporary rule for certain church agencies under church plan.
"(A) notwithstanding the provisions of paragraph (2)(B), a plan in existence on January 1, 1974, shall be treated as a church plan if it is established and maintained by a church or convention or association of churches and one or more agencies of such church (or convention or association) for the employees of such church (or convention or association) and the employees of one or more agencies of such church (or convention or association), and if such church (or convention or association) and each such agency is exempt from tax under section 501.
"(B) Subparagraph (A) shall not apply to any plan maintained for employees of an agency with respect to which the plan was not maintained on January 1, 1974.
"(C) Subparagraph (A) shall not apply with respect to any plan for any plan year beginning after December 31, 1982."
In 1978, P.L. 95-600, Sec. 152(d), inserted "408(k)," following "401" in subsecs. (b) and (c), effective for tax. yrs. begin. after 12/31/78.
In 1976, P.L. 94-455, Sec. 1901(a)(64)(A), amended the heading for subsec. (f) ... Sec. 1904(a)(64)(B), substituted "September 2, 1974" for "the date of the enactment of the Employee Retirement Income Security Act of 1974" in subsec. (1), effective for tax. yrs. begin. after 12/31/76.
Prior to amendment, the heading for subsec. (f) read as follows:
"(f) Multiemployer plan."
 P.L. 94-455, Sec. 1906(b)(13)(A), substituted "Secretary" for "Secretary or his delegate" in subsecs. (b), (c), and (g), effective for tax. yrs. begin. after 12/31/76.
In 1974, P.L. 93-406, Sec. 1015, added Code Sec. 414, effective 9/2/74, except for subsecs. (b) and (c). Subsecs. (b) and (c) are effective 9/2/74 or other date as specified in Sec. 1017 of the Act (reproduced following Code Sec. 401).
NOTES:
CODE OF FEDERAL REGULATIONS
Pension, profit-sharing, stock bonus plans, etc., 26 CFR §§ 1.401-0 et seq.
Temporary income tax regulations under Employee Retirement Income Security Act of 1974, 26 CFR §§ 11.401(a)-11 et seq.
Rules and regulations for minimum standards for employee pension benefit plans, 29 CFR §§ 2530.200a et seq.

RESEARCH GUIDE
AM.JUR.:
33 Am.Jur.2d, Federal Taxation (1988) paras. 3221, 3267, 3747, 3753-3758, 3760, 3764, 3791, 3793, 3848, 3921, 3949, 3950.
33 Am.Jur.2d, Federal Taxation (1991) paras. 3177, 3221, 3437, 3472, 3478-3483, 3487, 3494, 3527, 3529, 3602-3606, 3644.
33 Am.Jur.2d, Federal Taxation (1992) para. 3229, 3282, 3581, 3620, 3626-3631, 3635, 3642, 3681, 3682, 3771-3775, 3823.
33 Am.Jur.2d, Federal Taxation (1993) paras. 3159, 3212, 3581, 3620, XXXX-XXXX, 3635, 3641, 3682, 3771-3775, 3823.
60A Am.Jur.2d, Pensions and Retirement Funds §§ 14, 15, 47, 215-218, 222, 223, 266, 282, 340, 429, 464-467, 540, 545, 837, 954.
FORMS:
13A Fed.Procedural Forms L.Ed., Pensions and Retirement Systems §§ 53:61, 71.
13 Fed.Proc.Forms, L.Ed., Pensions and Retirement Systems §§ 53:32-53:34.
BANKRUPTCY SERVICE L.ED.:
Bkr.-L.Ed., Summary § 6:44.
RIA COORDINATORS:
1 RIA Employee Ben.Comp.Coord., Introduction to Coordinator paras. 1,003; 1,004; 1,008; 1,015; 1,017; 1,018.
1 RIA Employee Ben.Comp.Coord., Defined Benefit Pension Plans paras. 2,325; 2,330; 2,332; 3,402.4; 3,602.
*1152 1 RIA Employee Ben.Comp.Coord., Money Purchase Pension Plans paras. 4,324.2; 4,327.1; 5,403.3.
2 RIA Employee Ben.Comp.Coord., Profit Sharing Plans, Stock Bonus Plans, Thrift Plans paras. 6,318.2; 6,321.1; 7,403.3; 7,602.
2 RIA Employee Ben.Comp.Coord., Annuity Plans paras. 8,317; 8,323.1; 9,403.3; 9,602.
2 RIA Employee Ben.Comp.Coord., Annuity Plans paras. 9,403.3; 9,602.
2 RIA Employee Ben.Comp.Coord., Collectively Bargained Plans, Plans of More Than One Employer para. 10,308.
3 RIA Employee Ben.Comp.Coord., Government, Church and Similar Plans para. 17,426.
4 RIA Employee Ben.Comp.Coord., Withholding on Plan Distributions para. 30,058.
3 RIA Employment Coord., Participation, Vesting and Funding Requirements paras. B-14,102; 14,103; 14,105; 15,207; 15,405; 15,406.
3 RIA Employment Coord., Pensions paras. B-10,055, 10,149; 10,224.
3 RIA Employment Coord., Tax Qualification paras. B-12,190; 12,407.1; 12,407.2; 12,407.3; 12,501.
3 RIA Employment Coord., Non-Pension Benefits para. B-18,935.
4 RIA Employment Coord., Administration of Plans and Benefits para. B-23,056.
Employment Coordinator P.P. B-10,111, 10,121-10,125, 10,140, 10,146, 10,149, 12,190, 12,407.1-12,407.3, 12,501-12,511, 14,100-14,105, 15,405, 15,406.
Pension Coordinator P.P. 20,302, 20,303, 23,206-23,208, 23,244, 24,210.1, 24,330-24,332, 25,310-25,316, 25,601-25,612, 25,812, 25,850-25,858, 27,302-27,307, 27,508.
Federal Tax Coordinator 2d, P.P. H-5301, 5302, 6505, 6727, 6857, 7016, 7605.1, 7669-7681, 8608-8613, 9300-9311, 9539, 9630-9636, 9704, 9740, 11404.
TEXTS:
Rothenberg, Tax & Estate Planning for Divorce and Separation § 8:15.
Rothenberg, Tax and Estate Planning with Closely Held Corporations § 11:4.
LAW REVIEW ARTICLES:
Grinde and Schwartzberg, TEFRA: Its Impact on Retirement Plans and on Taxpayer Compliance. 15 Prac.Acc. 36, November, 1982.
Howard, Professional corporations and the affiliated service group. Tax Adviser 258, May, 1983.
Gehring, Rev.Rul. 81-105 and the Use of Professional Service Corporation Partnerships After the Enactment of Code Sec. 414(m). 59 Taxes 371, June, 1981.

INTERPRETIVE NOTES AND DECISIONS
Employer's designation of contributions controls, and contributions constitute taxable income, where state law does not avail itself of 26 U.S.C.S. § 414(h)(2) proviso allowing employers to "pick-up" employees contributions as employer contributions. Howell v. United States (1985, C.A.7 Ill.) 775 F.2d 887, 6 E.B.C. 2493, 85-2 U.S.T.C. para. 9773, 57 A.F.T.R.2d 86-768.
Qualified plans must be for exclusive benefit of employees or their beneficiaries, and leasing organization's pension plans do not qualify where organization's workers do not qualify as its employees; common-law factors are used to distinguish employees from independent contractors. Professional & Executive Leasing, Inc. v. Commissioner (1987) 89 T.C. 225, 8 E.B.C. 2153.
In determining whether workers are employees of employee-leasing company, common-law factors are used to distinguish employee from independent contractor; although no one factor is controlling, test considered fundamental is whether person for whom work is performed has right to control activities of individuals whose status is in question not only as to results but also as to means and methods used for accomplishing result; workers are not employees of leasing company where leasing company exercises minimal control, leasing company has no investment in work facilities and no opportunity for profit or loss except for amounts received as fees and monthly service rate payments. *1153 Professional & Executive Leasing, Inc. v. Commissioner (1987) 89 T.C. 225, 8 E.B.C. 2153.
Statute authorizing state retirement plans to establish "pickup" arrangements is not in itself sufficient to effectuate "pickup" of employee contributions, and accordingly state judge who agreed to have state deduct 11 percent of salary and deposit it with state retirement funds cannot exclude contributed amount from his income. Foil v. Commissioner (1989) 92 T.C. No. 24.
"Pick up" is effective when employer adopts resolution approving "pick up" of contributions to pension fund, and court does not accept IRS contention that effective date is ruling date rather than resolution date since such would allow IRS, rather than employer, to control when pick up begins contrary to legislative intent of § 414(h)(2). Slechter v. Commissioner (1987) TC Memo 1987-528, 54 T.C.M. 897.
It is not effective for federal income tax purposes to retroactively designate taxpayer's prior year employee contributions as employer contributions. Alderman v. Commissioner IRS (1988) T.C.Memo 1988-49, 55 T.C.M. 86, 9 E.B.C. 1562.
Mandatory contributions by state employee were not "picked up" until year when state designated those contributions as employee contributions. Mettler v. Commissioner (1989) 11 E.B.C. 1192, T.C.Memo 1989-301, 57 T.C.M. 775.
In determining whether retirement plan is governmental plan within meaning of § 414(d), factfinder considers whether organization is government agency or instrumentality, and factors include degree of control that federal or state government has over everyday operations, law creating organization, source of its funds, manner in which trustees or operating board are selected, and whether other governmental units consider organization's employees to be government employees; plan adopted by volunteer fire company incorporated under state nonprofit corporation law is not governmental plan where municipalities do not exercise control over fire company, expenses are paid largely by community donations, and trustees who control operations are elected by volunteer firefighters. Rev.Rule 89-49, 1989-15 I.R.B. 10.
Retirement plan maintained by organization was not governmental plan within meaning of 26 U.S.C.S. § 414(d), where governmental unit did not have sufficient control over organization. Rev.Rule 89-49, I.R.B. 1989-15, p. 10.
Employee benefit plans of two employers related in manner described in 26 U.S.C.S. § 414(b) or (c) that separately are fully integrated with social security and that may cover some of same employees do not satisfy integration rule of 26 U.S.C.S. § 401(a)(5) and may violate §§ 401(a)(4) and 410(b). Rev.Rule 79-236, 1979-2 C.B. 160.
Defined benefit plan that is funded by group deferred annuity and that provides for mandatory employee contributions, experience dividends, offsetting of employer contributions by mandatory employee contributions, and, on separation from service, computation of lump sum attributable to employee contributions as these contributions with 3 1/2 percent interest is not a plan described in 26 U.S.C.S. § 414(k). Rev.Rule 79-259, 1979-2 C.B. 197.
Employee contributions to governmental plan are not "picked up" by employer within meaning of 26 U.S.C.S. § 414(h)(2) and are not excludable from employee's gross income where employee voluntarily agreed that employer would make required contributions directly to state pension plan rather than including amount in employee's salary. Rev. Rule 81-34, 1981-2 C.B. 565.
Employee contributions to government plan are "picked up" by employer within meaning of 26 U.S.C.S. § 414(h)(2) and excludable from gross income of employee where employer specifies that contributions are paid by employer in lieu of contributions by employee and employee, pursuant to union negotiating agreement, has no option to receive contributed amounts directly instead of having them paid in to pension plan. Rev. Rule 81-36, 1981-2 C.B. 589.
Law partnership P consisting of corporate partners A, B, C and 10 individual partners *1154 which employs as common law employees some lawyers, paralegals, and clerical workers may be designated as first service organization and corporations A, B, and C as partners in that organization who regularly perform services for it; accordingly they are "any service organization" within meaning of 26 U.S.C.S. § 414(n)(1) and therefore A, B, and C and first service organization P constitute affiliated service group and all employees of corporations A, B, C, common law employees of P and partners of P are considered as employed by single employer. Rev. Rule 81-105, 1981-12, p. 27.
Where degree of control exerted by governmental entity over organization's plan is minimal, plan is not governmental plan; where volunteer fire department, organized by citizens of municipality to provide fire protection services, establishes retirement plan, but there is no specific legislation affiliating company with state, and state does not treat employees as employees of state or political subdivision, plan is not governmental plan. Rev.Rule 89-49, 1989-1 C.B. 117.
Plan can qualify as collectively bargained plan even though it is instituted by Bankruptcy Court as part of Chapter 11 reorganization. Private Letter Ruling 9113036.
DAN M. LEE, Presiding Justice, dissenting:
In the case sub judice, the chancellor failed to make findings of fact which satisfy our standards for equitably dividing property in favor of a spouse. With absolutely no finding or evidence in the record that Brenda Parker made any contribution towards the acquisition of David's 100% employer-funded profit sharing plan, and without more than the mere finding that "both parties are in good health, that Mr. Parker has substantially greater wage earning capacity, even though Mrs. Parker, at $10.00 an hour, is doing very well," the chancellor equitably divided David's profit sharing plan by awarding Brenda an interest therein.
Nevertheless, the majority affirms the chancellor's improper actions, ignoring our limited standard of review pertaining to a chancellor's findings of fact by participating in reckless speculation concerning what Brenda and David "would likely" have done and what they probably "intended." Because the chancellor erred and, on appeal, this Court should not go beyond the record, engaging in rank conjecture and generating creative circumstances for the purpose of hypothesizing as to what the parties "would likely" have done and second-guessing the chancellor as to what they "intended," I respectfully dissent.

I.
A string of prior cases is cited by the majority which hold that a chancellor may order a fair division of jointly accumulated property (marital property) incident to a divorce. That issue is not contested here. In Jones v. Jones, 532 So.2d 574 (Miss. 1988), this Court stated that:
In summary, the authority of the chancery court to effect an equitable distribution of marital property upon the dissolution of the marriage is guided by the following principles:
... .
(4) A spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding.
Jones v. Jones, 532 So.2d 574, 580 (Miss. 1988) (emphasis added  citations omitted).
But, the proposition that a chancellor may order an equitable division of property begs the dispositive question in the case sub judice  what finding did the chancellor make regarding a contribution by Brenda towards the acquisition of David's profit sharing plan which was 100% funded by his employer such that it should be characterized as jointly acquired, or what other finding was made by the chancellor which would justify an award of a 30% interest in the profit sharing plan to Brenda under our jurisprudence?

A.
In the case sub judice, the chancellor did not make the requisite finding to support an award to Brenda of 30% of David's employer-funded *1155 profit sharing plan. The portion of the chancellor's opinion which reiterates his findings follows:
The Court finds that both parties are in good health, that Mr. Parker has substantially greater wage earning capacity, even though Mrs. Parker, at $10.00 per hour, is doing very well. In considering these factors, it is the opinion of the Court that Mrs. Parker should be awarded 30 percent of Mr. Parker's currently vested profit sharing plan; and a qualified domestic relations order to that effect will be entered.
(emphasis added).
As the majority correctly recognizes and then fails to heed, our appellate standard of review requires that, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990). Applied to the case sub judice, since the record supports those findings, we are required to respect the chancellor's finding that: 1) both David and Brenda were in good health; 2) David had substantially greater wage-earning capacity than Brenda; and 3) Brenda is, nonetheless, doing well, earning $10.00 per hour. Those are the only findings made in the case sub judice.
From those findings, the chancellor leaped to the unsupported conclusion that Brenda should be awarded 30% of David's profit sharing plan. But, why shouldn't Brenda have been awarded 10%, 20% or 90%? Why not somewhere between 40% and 80%? Considering the scant findings made by the chancellor and the lack of other evidence in the record, the 30% interest which the chancellor awarded to Brenda is totally arbitrary. Nowhere in his findings does the chancellor made any finding which substantiates the award of 30% interest to Brenda in David's employer-funded profit sharing plan.
Regardless of its basis for extrapolating a conclusion that Brenda was entitled to an equitable division of some amount of David's profit sharing plan, the majority fails to offer any factual basis to support the chancellor's award to Brenda in the specific amount of 30%, as opposed to some other percentage amount. As a consequence, the majority join the chancellor's folly of awarding an arbitrary amount of property to Brenda.
It is apparent to everyone who reads the chancellor's findings that, by the explicit wording of his findings, the chancellor did not make any finding which supports an award to Brenda in the amount of 30%, or any other particular amount. Quite simply, any application of our law to the limited findings of fact made by the chancellor in the case sub judice would not result in a duplication of an arbitrary award of a 30% interest to Brenda in the property at issue. Such an arbitrary or whimsical result would not reflect sound jurisprudence.

B.
Nevertheless, the majority finds no impropriety in the chancellor's actions. Therefore, let us examine the proof which the majority espouses as sufficient for its second-guessed finding. The majority states that, "[o]ne hundred percent of the contributions to the plan were made by David's employer." This statement is absolutely correct. Brenda did not directly contribute even one percent (1%) to the profit sharing plan. However, following closely on the heels of that admission, the majority makes the result-oriented, unsubstantiated conclusion that, "Brenda contributed to the marital assets and, indirectly to David's profit sharing plan. David's quality work for his employer, which resulted in job security and a vested pension, is, in part, a result of Brenda's efforts. She worked both in and outside the home, providing income for the family and helping create a stable home life for the Parker family."
According to the majority's apparent reasoning, David would not have worked and earned the profit sharing plan "but for" Brenda's efforts. Not only is such a conclusion implausible, the record contains absolutely no evidence which indicates that David could not, or would not, work if Brenda had not "worked both in and outside the home." It is unreasonable to assume that one spouse is unable to work "unless" the other spouse is also employed or works in and around the home. If that were true, how would the majority explain how a parent who is widowed, *1156 divorced, or never entered matrimony can maintain gainful employment and take advantage of an employer's profit sharing plan without the help of a spouse. Surely the majority does not expect us to believe that spouse-less persons cannot work and obtain the same employment benefits as those who are married.
The majority does not limit its conjecture to an apparent determination that David would not have worked and earned employment benefits "but for" Brenda's efforts. The opinion of the majority amplifies the spin on its yarn by going beyond the chancellor's explicit findings, as well as the entire record, engaging in hypothetical supposition regarding what Brenda and David might have done. The majority states that, "[h]ad David's employer not provided this form of retirement, the couple would likely have foregone some luxuries or non-essentials in order to fund an independent account with either David's or Brenda's wages, or some combination thereof... . It would be equally short-sighted to assume that the pension sharing plan funding by David's employer was intended to be David's `separate' estate, to provide only for David. Surely, if Brenda had so intended, she would have diverted some of her earned wages from family use to fund her own savings account." (emphasis added). The immediately foregoing statements from the majority's opinion are neither statements of the law nor statements of fact. Consequently, this Court should forego the opportunity to participate in such imprudent speculation.

II.
Recently, we decided Armstrong v. Armstrong, 618 So.2d 1278 (Miss. 1993), in which the divorcing wife maintained that she was entitled to a portion of her husband's pension. Even though the divorcing wife had worked in the home during the marriage, this Court did not find that she was entitled to an equitable distribution of her spouse's pension. There, we stated that:
Nina did not continue higher education but devoted her time and efforts toward making a home for the parties, rearing the children, and engaging in part-time work for various employers.
... .
Nina maintains that she is entitled to one-half of Stanley's pension and stock... . Nina has no vested right to the pension or stock. We cannot say the chancellor's failure to award her a portion thereof was an abuse of discretion requiring reversal.
Armstrong v. Armstrong, 618 So.2d 1278, 1279-82 (Miss. 1993).
Factually, the situation of the parties in the case sub judice and that of the parties in Armstrong is quite similar: (a) both the Parkers and the Armstrongs were married in 1971 and divorced in 1992; (2) neither wife was adjudicated to be at fault; (c) both the Armstrongs and the Parkers had two children; (d) both Brenda and Ms. Armstrong worked in and out of the home during their respective marriages; (e) both Mr. Armstrong and David acquired non-wage benefits through their employer; (f) at the time of trial, Ms. Armstrong received income of approximately $14,000.00 annually, compared to Brenda's annual income of $12,000.00; (g) David's annual income was approximately $30,500.00, while Mr. Armstrong's income was moderately greater at approximately $40,200.00 annually.
Based upon the facts in Parker and the facts in the record in the case sub judice, the two cases are in accord. Yet, in the case sub judice, the majority sheds its appellate responsibility by engaging in imprudent conjecture in an attempt to justify an opinion that contradicts the recent holding in Armstrong. But, that action demonstrates disrespect for both the law and the facts, denigrating the decisions of this Court to valueless hollow rhetoric.

III.
The majority refuses to recognize and honor the fact that the chancellor did not make findings of fact that would support an equitable division of David's 100% employer-funded profit sharing plan in favor of Brenda, much less an award in the specific amount of 30% of that property. Instead, the majority resorts to a strained effort to overcome the absence of such findings, resulting in hazardous jurisprudence.
*1157 Therefore, with great deference to my colleagues, I would reverse and remand the award of 30% interest to Brenda in David's 100% employer-funded profit sharing plan, as well as the entry of the Qualified Domestic Relations Order affecting it, and affirm the lower court in all other respects.
McRAE, J., joins this opinion.
McRAE, Justice, dissenting:
The majority opinion brings to mind the Marxist rule of equality, "from each according to `his ability,' to each according to his [or her] needs." Accordingly, I join Justice Lee's dissent, but write separately to express my concern with the majority's approach to determining Brenda's "equitable" share in David's profit sharing plan. In its attempt to justify its finding that the profit sharing plan is a marital asset subject to division upon divorce, the majority indulges in sheer speculation, a practice we have discouraged in our chancery courts. By treating the profit sharing plan as a pension plan, without distinguishing one from the other, it mixes financial apples and oranges. Moreover, in a footnote, the majority states that one spouse will be entitled to the future assets of the other's vested profit sharing plan accruing long after the marriage has ended, contrary to the finality which equitable distribution is intended to engender.
The profit sharing plan at issue is wholly funded by David's employer. However, by painting a scenario of "what might have been," the majority colors the plan as "jointly accumulated property." Without any evidence, it suggests that had David's employer not provided a "retirement" [profit sharing] plan, "the couple would likely have foregone some luxuries or non-essentials in order to fund an independent account." Further, the majority tells us that had the employer intended to provide benefits for David, Brenda "would have diverted some of her earned wages from family use to fund her own savings account." Absent some evidence of this family's particularly astute financial foresight, we should not build our law upon bald speculation.
As the old saying goes, "if it ain't broke, don't fix it." Why effect such drastic change when we have in place a good system of lump-sum and periodic alimony? The majority, however, apparently seeks to make Mississippi a community property state. It designs instead a creature of judicial whim.[1] When the division of property upon divorce is governed by legislative mandate, a couple knows in advance which assets will be divided and which will not. Today's decision, which provides for an equitable division of marital assets as broadly defined in Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), without establishing objective criteria for the imposition of the equitable division of a profit sharing plan or even referencing the factors enumerated in Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), creates a situation wherein one spouse may reap all the financial benefits of the marriage, leaving the other to pay all of the bills. In essence, it allows the redistribution of marital wealth based not on contribution, but on a chancellor's subjective perception of the needs of the recipient spouse. We used to call this alimony, but have now expanded it to include everything owned by any spouse, reminiscent of the proverbial adage, "what's mine is mine, what's yours is mine, too" and contrary to our statutes providing for separate estates. See Miss. Code Ann. § 93-3-1. Now the only so-called contribution a spouse must make to obtain an "equitable division" of marital assets is simply to be married and later, to decide when to file for a divorce.
Today's opinion contravenes recent decisions of this Court which have recognized that Mississippi is not a community property state and held that one spouse has no vested right in the other's retirement pension. Davis v. Davis, 626 So.2d 111 (Miss. 1993); Flowers v. Flowers, 624 So.2d 992 (Miss. 1993); Armstrong v. Armstrong, 618 So.2d 1278, 1282 (Miss. 1993); Southern v. Glenn, 568 So.2d 281 (Miss. 1990). But see Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994) (in *1158 addition to alimony, wife awarded fifty percent of husband's military and civil service pensions as of the date of judgment). Contrary to the majority's directive, we have found that pension plan assets are part of the stream of income a chancellor may consider when determining alimony and child support as well as modifications thereto. Brown v. Brown, 574 So.2d 688, 691 (Miss. 1990); Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990). See also Powers v. Powers, 465 So.2d 1036 (Miss. 1985) (under Mississippi marital property law, military pension can be divided as part of alimony award). Moreover, once the assets of a retirement plan have been classified as property and divided between the parties, and one party later seeks a modification of alimony, that part of the plan attributable to the paying spouse can no longer be considered part of the stream of income available for purposes of determining alimony. We cannot treat David Parker's plan differently because it is an income-oriented profit sharing plan as distinguished from a pension or retirement plan. It is interesting to note that the legislature has exempted from seizure under execution or attachment those payments from pension or retirement plans necessary to support a debtor and any dependents. Miss. Code Ann. § 85-3-1 (1991). Ironically, what the legislature has seen fit to protect from creditors, this Court now decrees subject to division between divorcing spouses.
I further note that while the majority embraces the Hemsley definition of marital assets, which encompasses "any and all assets acquired or accumulated during the course of the marriage," footnote 5 of the opinion surreptitiously places contributions, dividends, interest or appreciation accruing in a pension or profit sharing plan after the marriage has been dissolved within the ambit of divisible property. In the footnote, the majority states that "[b]y awarding a percentage, rather than a fixed dollar amount, the chancellor has insured that Brenda will share in possible future benefit increases of her interest." This contradicts the primary goal of equitable distribution, to effect a final separation of the parties and complete any business between them at the time of the divorce.
Mississippi is not a community property state. Further, neither the legislature nor this Court has specifically defined marital property. Accordingly, I dissent.
HAWKINS, C.J., joins this opinion.
NOTES
[1] Under the Internal Revenue Code, the alternate payee/spouse or former spouse is liable for the applicable income taxes. 26 U.S.C.A. § 402(e)(1)(A) (Supp. 1993).
[2] The QDRO should also specify that the ex-wife is to be treated as the participant's surviving widow in order to insure that the ex-wife's rights to the various retirement funds will not terminate at participant's death. 26 U.S.C.A. § 414(p)(5). See Appendix A.
[3] For a detailed discussion, see generally Alden J. Bianchi, An Intro to QDRO, Probate and Property, July/August 1992, pp. 14-19, a publication of the American Bar Association.
[4] The Omnibus Budget Reconciliation Act of 1993 (P.L. 103-66), 8/10/93, resulted in a new ERISA section, § 609, which requires employer-sponsored group health plans to provide benefits for participants' children in accord with a "qualified medical child support order."
[5] By awarding a percentage, rather than a fixed dollar amount, the chancellor has insured that Brenda will share in possible future benefit increases of her interest, although David will benefit from all future contributions and any increases to his interest.
[1] The author of the majority opinion has recognized that Mississippi is not a community property state. Davis v. Davis, 626 So.2d 111 (Miss. 1993) (Prather, P.J., concurring). However, today's opinion takes us well beyond community property into heretofore unchartered territory.