LEE, J., for the court.
¶ 1. Gwendolyn Warren appeals a judgment of the Chancery Court of Rankin County which denied her request to modify a judgment of divorce in which she was ordered to pay her former husband a monthly payment from her retirement account. Having found that the chancellor did not err, we affirm.
FACTS
¶ 2. Lewis and Gwendolyn were divorced by a judgment of divorce on the grounds of irreconcilable differences. Pursuant to the parties’ property settlement agreement which was incorporated into the chancellor’s final judgment, Gwendolyn was required to pay Lewis, for the remainder of her lifetime, the sum of $225 per month from her retirement account with the Mississippi Public Employees Retirement System. The basis for this agreement was the sale of the parties’ home which Lewis owned before the marriage. Although she was not entitled to any interest in the home, Gwendolyn was given $38,000 from the proceeds of the sale and under the terms of the property settlement agreement, she agreed to pay Lewis $225 per month for the remainder of her life. The property settlement agreement specifically stated that both parties waived any claims or entitlements to alimony from the other.
¶ 3. Gwendolyn filed a “Petition to Modify Alimony” in which she alleged that there had been a substantial change in circumstances, i.e., Lewis’s remarriage and her inability to work due to her disability, such that she should no longer be required *459 to pay Lewis alimony.[1] In response, Lewis filed a petition for money judgment and contempt against Gwendolyn requesting a money judgment, attorneys fees and the incarceration of Gwendolyn until she purged herself of contempt. Lewis alleged that she was over $1100 behind in making payments to him.
¶ 4. At a hearing on the matter, Gwendolyn testified that she had been placed on full disability and was no longer able to work. She was living on an income of about $2000 from her state retirement and disability payments. She stated that at the time of their divorce she would have signed anything Lewis wanted her to sign and she did not understand the consequences of signing the property settlement agreement. She acknowledged that she gambled some, but denied losing large sums as she indicated she played with only nickels and pennies.
¶ 5. There was testimony that Gwendolyn had previously been ordered by the chancellor to participate in Gamblers Anonymous and had previously fallen behind in payments to Lewis and was ordered to pay an additional $50 monthly to pay off that arrearage. Gwendolyn testified that she attended the program although she felt it was not for her because she did not drink or use drugs and most of the participants in the program had such problems.
¶ 6. Following the hearing, the chancellor entered his findings of fact and conclusions of law and judgment. The chancellor determined that whether a “Qualified Domestic Relations Order” (QDRO) was entered was of no consequence in determining the issues presented before him. The chancellor concluded that the parties agreed to all the terms in the agreement, signed it, were represented by attorneys, entered into it voluntarily and, having no evidence pointing to the contrary, the property settlement agreement met the requirements to be a legally enforceable contract.
¶ 7. Next, the chancellor addressed the matter of whether the $225 payments were legally disguised alimony. The chancellor’s findings provided:
2. The basic controversy centers around Paragraph 5 of the agreement which states the following:
“Wife shall set over for Husband, and he shall have $225.00 per month during Wife’s lifetime from her retirement benefits from the Mississippi Public Employers Retirement Systems and a QUADRO [sic] shall be entered to enforce this provision. This payment shall begin on the first day of the month after the house is sold per Paragraph 1.”
The wording of “this payment shall begin on the first day of the first month after the house is sold per Paragraph 1” was penned in and interiineated into Paragraph 5 and was initialed by Gwen and Lewis. In addition to Paragraph 5 of the agreement the Court must look at Paragraph 10 of the same agreement which states, “Husband and Wife each waive any claim for alimony or spousal support against the other.”
3. Testimony in the case revealed that Gwen took from the agreement the sum of $38,000.00 from the sale of the house of the parties which Lewis owned prior to the marriage of the parties and Lewis agreed to accept the sum of $225.00 per month from Gwen in lieu of any money from the sale of the property.
*460 In finding that the payments were not alimony, the chancellor stated: “In light of the terminology contained in Paragraph 5 of the agreement when taken in conjunction with Paragraph 10 of the agreement, this Court cannot and does not find that it is alimony in any form.” Finally, the chancellor found Gwendolyn in civil contempt of court in the amount of $1050 and required her to pay attorneys fees in the amount of $350 and court costs.
¶ 8. In her brief to the lower court as in her brief before us, Gwendolyn challenges the validity of the property settlement agreement arguing that the $225 payments to Lewis from her retirement account violate federal law regarding an alternate payees’ rights to receive a portion of the benefits payable under a plan as provided in a QDRO. She also contends that because no QDRO exists, Lewis has no vested right to receive payment. She maintains that the $225 payment looks like, feels like and actually is alimony subject to modification. Finally, she contests the validity of the property settlement agreement pertaining to the lifelong payments to Lewis on the basis that such a contract is unconscionable and therefore void.
RESOLUTIONS OF THE ISSUES

1. Failure to enter a QDRO

¶ 9. Gwendolyn argues that because a QDRO was never entered, Lewis cannot have a vested interest in her retirement plan. The property settlement agreement does not specify who was responsible for having the QDRO entered, though Lewis contends that it was Gwendolyn’s responsibility to do so. Nevertheless, the time period for filing such a document in securing an interest in Gwendolyn’s retirement has now lapsed. Gwendolyn asserts that because a QDRO was not entered, it is a violation of the Internal Revenue Code to give Lewis a vested interest in her retirement. Gwendolyn points us to section 414(p)(6)(A)(i) of the Internal Revenue Code which governs a pension plan administrator’s procedures once a QDRO has been filed and is accepted.
¶ 10. In the equitable division of property as a consequence of divorce, an alternate payee’s interest in a pension plan vests only after the chancellor has determined that an equitable division of the marital assets requires awarding some portion of one spouse’s pension or profit sharing plan to the other spouse and a QDRO is entered and accepted as qualified. Parker v. Parker, 641 So.2d 1133, 1139 (Miss.1994). Furthermore, we know that property settlements incorporated in a divorce decree are not subject to modification. East v. East, 493 So.2d 927, 931-32 (Miss.1986). Such an agreement is similar to any other contract, and the fact that it is between divorcing spouses, and incorporated in a divorce decree, does not change its character as a contract. Id. Agreements created in the process of the termination of the marriage by divorce are contracts,“made by the parties, upon consideration acceptable to each of them, and the law will enforce them.” Lewis v. Lewis, 586 So.2d 740, 745 (Miss.1991); McManus v. Howard, 569 So.2d 1213, 1215 (Miss.1990).
¶ 11. In this case, the chancellor determined that the payment of $225 was not alimony as Gwendolyn asserts and that she contractually obligated herself to make such payments under the terms of the property settlement agreement. It is true that Lewis is not vested in Gwendolyn’s retirement program and pursuant to the applicable regulations he may not become vested because the time has lapsed for gaining a vested interest in Gwendolyn’s retirement. Notwithstanding this, Gwendolyn is still obligated pursuant to the terms of the property settlement agreement to *461 provide the $225 monthly payments to Lewis. The contractual obligation to make such payments cannot be side stepped by the failure of a QDRO to be filed. It would have benefitted Lewis to see to it that the QDRO was timely filed. Nonetheless, the absence of a QDRO here only prohibits Lewis from obtaining security in the fulfillment of Gwendolyn’s obligation to him and has no effect on Gwendolyn’s commitment to pay him monthly. Furthermore, we agree with the chancellor that Gwendolyn’s obligation to make monthly payments to Lewis arose out of their contractual agreement and not an agreement to provide alimony to support Lewis. Even further, the property settlement specifically states that neither party was entitled to alimony.
¶ 12. Federal law involving the administration of Gwendolyn’s pension plan has not been violated. As stated, Lewis does not and cannot now at this point obtain a vested interest in Gwendolyn’s state retirement monies.

2. Unconscionable contract

¶ 13. Divorce decrees are viewed as quasi-contracts. Grier v. Grier, 616 So.2d 337, 340 (Miss.1993). “[W]here a property settlement agreement is entered into in contemplation of a divorce on the grounds of irreconcilable differences, there is more at work than general contract law.” Grier, 616 So.2d at 340. While a properly drafted agreement may be binding on the parties, the chancellor is within his discretion to modify the terms in a divorce decree where he finds it is necessary to protect the parties because the courts are not used as tools “for implementing unconscionable contracts which are not fair to either party.” See Miss. Const, art. IV, § 94.
¶ 14. An unconscionable contract is said to be an agreement by which “one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other....” In re Will of Johnson, 351 So.2d 1339, 1341 (Miss.1977). The property agreement in this case is not such a contract. Gwendolyn made a bargained for exchange. Apparently having determined that she was not entitled to the proceeds of the marital home in an equitable division of property, Lewis nonetheless agreed to give Gwendolyn $38,000 of the home’s proceeds following its sale because she needed the money and she was willing to agree to provide the $225 payment monthly and for her lifetime to him in return.
¶ 15. Other than the testimony of Gwendolyn that she did not realize what she was doing when she made such an agreement, there is no other evidence suggesting that the contract made between the parties is unconscionable. Having listened to and considered the testimony exacted at the hearing on the matter, the chancellor was within his discretion in determining the credible evidence and ruling that Gwendolyn was bound to the terms of the property settlement agreement. We find no error and therefore affirm.
¶ 16. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., THOMAS, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ„ CONCUR. BRIDGES, J., NOT PARTICIPATING.

. In her petition, she referred to the amount she agreed to repay as alimony notwithstanding a specific denial of the right to any alimony by either party pursuant to their contractual agreement.