24 So.3d 325 (2009)
Sidney Kelton PACE, Appellant
v.
Melanie Jean PACE, Appellee.
No. 2008-CA-00380-COA.
Court of Appeals of Mississippi.
November 24, 2009.
*327 David A. Roberts, attorney for appellant.
Mark H. Watts, Pascagoula, Ray T. Price, Hattiesburg, attorneys for appellee.
Before MYERS, P.J., ISHEE and MAXWELL, JJ.
ISHEE, J., for the Court.
¶ 1. Sidney Pace and Melanie Pace were granted a divorce on the ground of irreconcilable differences on December 4, 2002; the judgment of divorce incorporated a written agreement concerning custody and property settlement. Thereafter, on July 7, 2005, Melanie filed a complaint for contempt in the Chancery Court of Jackson County, alleging that Sidney was in arrears on his agreed payments. Sidney responded and asked the chancery court to find the agreement unconscionable and, therefore, unenforceable. The chancery court held a hearing on the matter and refused to find Sidney in contempt. In the judgment, the chancery court modified some provisions of the agreement but, for the most part, left it intact. Aggrieved, Sidney appeals and presents the following issues for consideration:
I. Whether it was error to refuse to find the property settlement agreement to be unenforceable based on its unconscionability and ambiguity.
II. Whether it was error to order payment of the arrearage on the mortgage, property taxes, and property insurance.
III. Whether it was error to refuse to modify the property settlement agreement to clarify the ambiguous terms.
IV. Whether the chancery court's ruling was ambiguous and unenforceable.
Finding no error, we affirm.

FACTS
¶ 2. Melanie and Sidney were married on June 7, 1986, and they had three children during their marriage, all of whom were minors at the time of the proceeding in chancery court. Melanie and Sidney separated on or about May 29, 2002, and on December 4, 2002, they were granted a divorce on the ground of irreconcilable differences.[1] The parties had previously signed an agreement for custody and property settlement (the Agreement), which was signed by Sidney on September 17, 2002, and by Melanie on September 24, 2002. The Agreement was incorporated into the final judgment of divorce.
¶ 3. Sidney did not consult an attorney before signing the Agreement, despite the fact that he was a doctor and had the financial means to do so. The Agreement provided that the parties would share joint legal custody of the three minor children, with Melanie receiving primary physical custody and Sidney receiving visitation. In pertinent part, the Agreement included the following provisions: (1) Sidney shall pay $1,500 or twenty-two percent of his income per month in child support; (2) Sidney shall maintain medical, health, dental, and optical insurance through his employer for Melanie and the three children, and Sidney shall be responsible for any costs not covered by that insurance; (3) Sidney shall be responsible for the payment to obtain school uniforms; (4) Sidney shall be responsible for the payment of the daycare expenses; (5) Sidney shall be responsible for the payment of the children's college expenses and extracurricular activities; *328 (6) Sidney shall maintain $500,000 worth of life insurance for the benefit of Melanie and the children; (7) Sidney shall be allowed to claim the children for tax purposes; (8) Melanie shall be awarded all assets and interest that Sidney has or may acquire in his professional associations or corporations; (9) Melanie shall be awarded the marital home in Ocean Springs, Mississippi, with Sidney to be responsible for the remaining indebtedness, taxes, and insurance on the home; (10) Melanie shall be awarded the 1999 GMC Suburban, and Sidney shall purchase Melanie a new vehicle every four years and be responsible for payments of said vehicles; (11) Sidney shall be awarded the home in Pascagoula, Mississippi, and the 1999 Jeep Wrangler; (12) Melanie shall waive any interest in Sidney's medical practice; (13) Sidney shall pay Melanie $1,500 per month in alimony, to increase to $4,500 per month if Melanie "is fired, quits, laid off, or her position of employment with [Sidney's] office and/or company is terminated for any reason ...," with alimony to survive Sidney's death or Melanie's remarriage; and (14) each party shall waive any right to the other party's retirement.
¶ 4. Following the parties' divorce, Sidney made payments of $6,000 per month to Melanie. According to Sidney, this represented $1,500 in alimony, $1,500 in child support, and $3,000 for Melanie's household expensesitems such as the mortgage and car payment that he had agreed to pay. Sidney contended that he paid more than he was required to pay under the Agreement. However, Melanie claimed that he was in arrears in his payments for the mortgage, taxes, and insurance because she thought the $6,000 per month represented $4,500 in alimony and $1,500 in child support. Sidney did not make any payments for the school uniforms or for daycare, but Melanie admitted that she never sent him a bill for those expenses. Also, Sidney never added Melanie as a beneficiary to the $500,000 life insurance policy that he maintained for the children, and Melanie never executed a release of her claims to Sidney's retirement.
¶ 5. After hearing from the parties, the chancellor, for the most part, upheld the terms of the Agreement. However, the chancellor did find that: (1) Melanie waived the provision granting her an interest in Sidney's business; (2) Melanie waived the provision ordering Sidney purchase her a new car every four years; and (3) Sidney's obligation to pay alimony would cease upon his death or Melanie's remarriage. The chancellor found that there had not been a material change in circumstances that would warrant a reduction in alimony payments because Sidney's income had increased since the divorce; the chancellor also ordered Sidney to pay the arrearage on the marital home expenses: the mortgage, insurance, and taxes. The chancellor found that Sidney was not in willful contumacious contempt of court but did order him to pay $2,500 in attorney's fees to compensate Melanie for having to file the contempt action.

STANDARD OF REVIEW
¶ 6. This Court's standard of review in a domestic relations matter provides that a chancellor is "vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court was manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard." Pulliam v. Smith, 872 So.2d 790, 793(¶ 5) (Miss.Ct.App.2004) (citing Andrews v. Williams, 723 So.2d 1175, 1177(¶ 7) (Miss.Ct.App.1998)).

DISCUSSION

I. Property Settlement Agreement
¶ 7. Sidney first argues that the Agreement that he and Melanie signed *329 was unenforceable because it was unconscionable and ambiguous. He describes the Agreement as "one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other...." Warren v. Warren, 815 So.2d 457, 461(¶ 14) (Miss.Ct.App.2002) (quoting In re Will of Johnson v. Robinson, 351 So.2d 1339, 1341 (Miss.1977)). Sidney claims that he had no choice but to sign the Agreement, which had been drafted by Melanie's attorney, and Sidney had little time to study it or read it carefully. Furthermore, Sidney notes that he "was in the unfortunate position of having a pregnant girlfriend and a hostile wife."
¶ 8. Generally, a chancery court may modify an award of periodic alimony if there has been a material change of circumstances that "occurred as a result of after-arising circumstances not reasonably anticipated at the time of agreement." Dix v. Dix, 941 So.2d 913, 916(¶ 15) (Miss. Ct.App.2006) (citing Varner v. Varner, 666 So.2d 493, 497 (Miss.1995)). However, the supreme court has also stated that "[p]roperty settlement agreements are fixed and final, and may not be modified absent fraud or contractual provision allowing modification." Weathersby v. Weathersby, 693 So.2d 1348, 1352 (Miss.1997) (citing Mount v. Mount, 624 So.2d 1001, 1005 (Miss.1993); Brown v. Brown, 566 So.2d 718, 721 (Miss.1990); East v. East, 493 So.2d 927, 931-32 (Miss.1986)). In Weathersby, the supreme court stated that:
In property and financial matters between the divorcing spouses themselves, there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude. When the parties have reached agreement and the chancery court has approved it, we ought to enforce it and take as dim a view of efforts to modify it, as we ordinarily do when persons seek relief from their improvident contracts.
Weathersby, 693 So.2d at 1351 (quoting Bell v. Bell, 572 So.2d 841, 844 (Miss. 1990)); see also Kelley v. Kelley, 953 So.2d 1139, 1143(¶ 9) (Miss.Ct.App.2007) (noting that a property settlement agreement incorporated into the divorce decree is not subject to modification except in limited situations).
¶ 9. Sidney first notes that "[w]here a property settlement agreement is entered into in contemplation of a divorce on the ground[s] of irreconcilable differences, there is more at work than general contract law." Warren, 815 So.2d at 461(¶ 13) (quoting Grier v. Grier, 616 So.2d 337, 340 (Miss.1993)). He also bases his argument on the fact that a chancellor has discretion to modify a property settlement agreement "where he finds it is necessary to protect the parties because the courts are not used as tools `for implementing unconscionable contracts which are not fair to either party.'" Id.
¶ 10. Sidney would further have this Court find overreaching based on this Court's citation to the Florida District Court of Appeals' definition of the concept, which we stated as follows:
"[T]hat which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." Schreiber also stated that "overreaching involves the situation where one party, having the ability to force the other into an unfair agreement, does so."
Lowrey v. Lowrey, 919 So.2d 1112, 1119(¶ 27) (Miss.Ct.App.2005) (quoting Schreiber v. Schreiber, 795 So.2d 1054, 1057 (Fla.Ct.App.2001)). However, Sidney neglects to include this Court's later citation to Schreiber, where we stated as follows:

*330 [T]he Florida District Court of Appeal held that an agreement was not the product of overreaching where it was definitely one-sided and unfair, but that alone did not equate to overreaching absent a sufficient showing that the settlement agreement resulted from an inequality of bargaining power or other circumstances such that there was no meaningful choice on the part of the disadvantaged party.
Id. at 1121(¶ 35) (citing Schreiber, 795 So.2d at 1057). In Lowrey, this Court went on to summarize the wife's situation that evidenced overreaching, such as the fact that: the wife did not have an attorney; she could not afford an attorney; the husband threatened to see her in court if she hired an attorney; the husband threatened that he would "destroy her"; the husband threatened that she would never live in that town again or see her children again; and the wife signed the property settlement agreement at the law office of the husband's brother and attorney. Id. at (¶ 37).
¶ 11. We find nothing similar in the circumstances in the present case except for the fact that Sidney did not hire an attorney before signing the Agreement. We do not hold this factor against Melanie because Sidney was a successful doctor who certainly had the financial means to hire an attorney. The chancellor also found that Sidney had the intelligence to fully read and understand the Agreement before signing it. In the final judgment, the chancellor concluded that:
The Court is quite aware that Dr. Pace entered into an onerous agreement. As the evidence indicated, Dr. Pace was motivated to obtain a divorce, and according to Ms. Pace, Dr. Pace promised to take care of her and the children [by] entering into the property settlement agreement. This Court is mindful that the Agreement provided Ms. Pace with more in monthly support from Dr. Pace than likely would have been awarded had this matter been litigated before a chancellor. However, Dr. Pace entered into this Agreement of his own free will and accord and must live by the terms thereof.
The fact that he "was in the unfortunate position of having a pregnant girlfriend and a hostile wife" affords Sidney little sympathy or grounds to constitute overreaching.
¶ 12. Sidney's reliance on Duncan v. Duncan, 815 So.2d 480, 484(¶ 13) (Miss.Ct. App.2002) is similarly misplaced. In Duncan, the chancery court granted a divorce on the ground of uncondoned adultery, and the court made the determination as to the financial award. Id. at 482(¶ 1). Duncan is distinguishable from the present situation in which the parties were granted an irreconcilable differences divorce and signed a property settlement agreement.
¶ 13. In Lowrey, this Court stated that:
Our standard of review dictates that this Court must enforce a settlement agreement connected to a divorce action as long as that agreement received approval by the chancery court. There are two exceptions to our mandate to enforce an approved settlement agreement: this Court may not enforce such an agreement if the moving party demonstrates either fraud or overreaching.
Lowrey, 919 So.2d at 1118(¶ 23) (citations omitted). We find no evidence of such fraud or overreaching in the present case. Accordingly, this Court must enforce the Agreement into which the parties voluntarily entered and which was approved by the chancery court. We find that this issue is without merit.

*331 II. Arrearage
¶ 14. Sidney next takes issue with the chancellor's ruling that ordered him to pay the arrearage on the mortgage, insurance, and taxes for the marital home. To support his argument, he claims that he should only be obligated to pay $1,500 per month in alimony instead of the $4,500 per month that Melanie alleges he owes. Sidney argues that the Agreement contained a condition precedent that needed to be met in order for the alimony payments to increasethat Melanie no longer work at Sidney's office. According to Sidney, Melanie never really worked for him; therefore, she was not entitled to increased alimony because she never stopped working for him. Under Sidney's reasoning, he was not in arrears on any payments because he had been paying $6,000 per month, which included $1,500 for child support, $1,500 for alimony, and $3,000 for other expenses such as the mortgage, taxes, and insurance on the former marital home.
¶ 15. The provision of the Agreement with which Sidney takes issue provides the following:
It is understood and agreed between the herein parties that in the event Melanie Jean Ward Pace is fired, quits, laid off, or her position of employment with Sidney Kelton Pace's office and/or company is terminated for any reason whatsoever, then the amount of permanent, periodic alimony, shall be increased to four thousand five hundred dollars ($4,500.00), per month.
At trial, Melanie testified that she had performed various work for Sidney at his medical clinic. At the time the parties signed the Agreement, Melanie was no longer working for him; therefore, the condition precedent had already been satisfied.
¶ 16. The amount of the arrearage totaled $87,889.33, which included the following expenses for the former marital home: $62,466 for the mortgage, $10,633.33 for taxes, and $14,790 for insurance. These amounts were documented by Melanie at trial. The chancellor found that Sidney was able to pay the amount of alimony that he agreed to pay and further found that his income had actually increased since the time he signed the Agreement. Sidney agreed that he would pay $4,500 per month in alimony to Melanie if she was no longer working for him. We find no abuse of discretion or manifest error in the chancellor's ruling that Sidney was responsible for the arrearage claimed by Melanie. Accordingly, this issue is without merit.

III. Refusal to Modify the Property Settlement Agreement
¶ 17. In his third allegation of error, Sidney argues that the chancellor erred by failing to clarify the provisions of the Agreement in which Sidney agreed to pay for medical costs incurred by Melanie and the children and in which he agreed to pay for the children's college expenses. He cites error with the chancellor's refusal to apply Duncan, 815 So.2d at 484(¶ 14) in this case. On appeal, Sidney again cites Duncan, but he cites no other authority to support his position.
¶ 18. As previously stated, Duncan addressed an equitable division of marital assets and the corresponding award of alimony as determined by the chancellor. The present case involved an agreement to which both parties voluntarily agreed, and which the chancellor merely approved. The chancellor refused to apply Duncan for that very reason, and we find no error with the chancellor's ruling. This issue is without merit.

*332 IV. Ambiguity of the Chancery Court's Judgment
¶ 19. Lastly, Sidney takes issue with the chancellor's order that Sidney continue to pay the balance of the mortgage on the marital home, as was agreed. Sidney argues that the chancellor's judgment was vague in that it did not take into consideration the fact that Melanie had refinanced the mortgage. According to Sidney, the judgment failed to state "when the obligation would end or the amount due."
¶ 20. We disagree with Sidney's assessment of the chancellor's judgment. The chancellor clearly specified that:
The Court finds that Ms. Pace refinanced said home in order to receive a portion of the equity from the marital home for family expenses. This Court finds that Dr. Pace is not required to pay said amount of equity realized from the refinancing of the marital domicile, but he is responsible for the balance outstanding at the time of the parties' divorce. Thus, Dr. Pace is responsible for the amount of the house payment that existed at the time he agreed to the property settlement agreement.
Thus, Sidney's argument is contradicted by the chancellor's judgment, which clearly provides that Sidney is only responsible for the amount of the mortgage outstanding at the time he signed the Agreement. This issue is without merit.
¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. IRVING, J., NOT PARTICIPATING.
CARLTON, J., Dissenting.
¶ 22. I respectfully dissent. I submit that Sidney and Melanie Pace's property settlement agreement is ambiguous and riddled with conflicting terms and is, therefore, unenforceable due to ambiguity. Simply put, the contradictions and ambiguity prevent this Court from ascertaining the parties' intent. Moreover, a plain reading of the agreement fails to reflect that there was a meeting of the minds as to the terms. For example, the agreement provides that Melanie shall be awarded all assets and interest that Sidney has or may acquire in his businesses, professional associations, or corporations. Then, the agreement later states that Melanie shall waive any interest in Sidney's medical practice and business. These terms stand in conflict with one another, and as a result, the chancellor modified certain provisions of the agreement. However, modification of such an ambiguous contract results in a contract written by the court, and it is not the purpose of the courts to make contracts for parties. HeartSouth, PLLC v. Boyd, 865 So.2d 1095, 1109(¶ 41) (Miss.2003) (citations omitted).
¶ 23. Further, since the agreement fails to reflect a meeting of the minds, "[a] court cannot `draft a contract between two parties where they have not manifested a mutual assent to be bound.'" Ivison v. Ivison, 762 So.2d 329, 336(¶ 23) (Miss.2000) (quoting A. Copeland Enterprises v. Pickett & Meador, Inc., 422 So.2d 752, 754 (Miss.1982)). I respectfully submit that due to the ambiguity and conflicting terms of the agreement, the parties' intent cannot be ascertained, and the agreement fails to reflect mutual assent as to the terms. Hence, I would find the property settlement *333 agreement unenforceable due to such ambiguity. Accordingly, I must dissent from the majority's holding to affirm the chancellor's judgment.
NOTES
[1] Testimony revealed that Sidney was seeing another woman, who was pregnant with his child.